[Cite as *State v. Williams*, 2022-Ohio-2517.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2021-CA-66 |
| | : | |
| v. | : | Trial Court Case Nos. 2021-CR-369 and |
| | : | 2021-CR-592 |
| LORENZO WILLIAMS | : | |
| | : | (Criminal Appeal from |
| Defendant-Appellant | : | Common Pleas Court) |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 22nd day of July, 2022.

. . . . . . . . . . .

IAN A. RICHARDSON, Atty. Reg. No. 0100124, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
        Attorney for Plaintiff-Appellee

STEVEN H. ECKSTEIN, Atty. Reg. No. 0037253, 1208 Bramble Avenue, Washington Court House, Ohio 43160
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Defendant-Appellant, Lorenzo Williams, appeals from judgments in two trial court cases. In Clark C.P. No. 2021-CR-592, Williams appeals from his convictions on two counts of sexual battery, both third-degree felonies, and one count of intimidation of an attorney, victim, or witness in a criminal case, a first-degree misdemeanor. Following a jury trial, the court sentenced Williams to five years in prison on each sexual battery conviction, with the terms to be served consecutively, and to six months on the intimidation charge, to be served concurrently with the other sentences. The total prison term, therefore, was ten years. Williams was also designated a Tier III sexual offender and ordered to register with the sheriff in person every 90 days for the rest of his life.

**{¶ 2}** According to Williams, the trial court should have granted his motion to suppress evidence in Case No. 2021-CR-592, because law enforcement recklessly included misrepresentations in the affidavit used to obtain search warrants. Williams further contends that his convictions were based on insufficient evidence and were against the manifest weight of the evidence. For the reasons stated below, Williams's assignments of error are without merit, and the judgment in Clark C.P. No. 2021-CR-592 will be affirmed.

**{¶ 3}** The second case included in the notice of appeal is Clark C.P. No. 2021-CR-369, in which all charges against Williams were dismissed. In light of that fact, we told the parties to address our jurisdiction over the case. *See* Order (Feb. 8, 2022), p.1. Both parties have agreed that no appealable order exists concerning the case. *See* Williams's Brief, p. 10, and State's Brief, p. 3.

{¶ 4} We also agree. Dismissal of all charges left Williams in the same position as if the charges had not been filed. As a result, Williams's substantial rights were not affected, and no final appealable order exists. Accordingly, the appeal as it relates to Clark C.P. No. 2021-CR-369 will be dismissed.

I.   Facts and Course of Proceedings

{¶ 5} On September 15, 2021, an indictment was filed in Clark C.P. No. 2021-CR-592, charging Williams with five counts of rape, five counts of sexual battery, two counts of kidnapping, and one count of intimidation of an attorney, victim, or witness in a criminal case. The rape and kidnapping charges were first-degree felonies, the sexual battery charges were third-degree felonies, and the intimidation charge was a first-degree misdemeanor. The rape and kidnapping charges arose from incidents that occurred on separate dates: January 27, 2021, and November 28, 2021. They also involved two different victims. The intimidation incident allegedly occurred on September 6, 2021.

{¶ 6} After Williams pled not guilty, the court set a jury trial for November 16, 2021. A bill of particulars filed on November 3, 2021, outlined details relating only to the crimes that allegedly occurred on January 27, 2021, and September 6, 2021. These incidents involved one victim, R.T.

{¶ 7} On November 5, 2021, Williams filed a motion pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), challenging an affidavit and complaint that had been used to obtain a warrant for buccal swabs that were taken from Williams. On the same day, Williams filed a motion to dismiss the charges based

on a speedy trial violation. The trial court overruled the speedy trial motion on November 12, 2021.

{¶ 8} On the first day of trial, the court held a *Franks* hearing outside the presence of the jurors. No witnesses testified, as the circumstances relating to the motion were undisputed. However, the parties did present argument. *See* Trial Transcript ("Tr."), p. 5-15. After hearing the arguments, the court denied the motion. *Id.* at p. 15.

{¶ 9} Before trial began, the State also asked the court to dismiss counts 10, 11, and 12. Those counts concerned rape, kidnapping, and sexual battery charges based on the November 28, 2019 incident and a victim named D.L. *Id.* The court agreed to dismiss the counts without prejudice, which left counts one through nine and 13 remaining for trial. These included four rape counts, four sexual battery counts, one kidnapping count, and one count of intimidation of a witness. As indicated, these charges involved R.T. and allegedly occurred on January 27, 2021, and September 6, 2021.

{¶ 10} At this time, the State also told the court it wished to dismiss an indictment filed against Williams in Clark C.P. No. 2021-CR-369, and the court agreed to dismiss that case as well. Tr. at p. 16. As will be discussed more fully below, Case No. 2021-CR-369 involved Williams's girlfriend, L.R. Before filing charges in that case, the police obtained buccal swabs from Williams, because L.R. alleged that Williams had inserted a knife in her vagina. The DNA evidence from the swabs subsequently revealed a match with DNA found in R.T.'s vagina.

{¶ 11} At trial, the State presented testimony from R.T. and several other people, including police officers, medical personnel, a forensic expert, and R.T.'s friends. Other

than R.T., none of these witnesses were present during the January 27, 2021 incident, which occurred in a hotel room. Williams presented evidence from one witness, his girlfriend, L.R., who was also not present in the hotel room, but she was in the car when R.T. and Williams drove to the hotel.

{¶ 12} R.T.'s account at trial was as follows. On January 27, 2021, R.T. was at a friend's apartment along with a lot of other people, including Williams. *Id.* at p. 162-163 and 174. At the time, R.T. had been up (i.e., had not slept) for a few days because she was "on the streets" and was staying at a houseful of drug addicts. R.T. was staying there because that was the only place she had to go. *Id.* at p. 181 and 184. R.T. said that she and Williams left the apartment because her friend, Mandy, wanted food. However, they did not get food. Instead, they drove to a couple of places, doing alcohol and "some weed," and ended up at the USA hotel. *Id.* at p. 163-164 and 174. R.T. indicated that another woman (Williams's girlfriend, L.R.), was in the car when she and R.T. went to the hotel, but L.R. was not in the car the entire time. *Id.* at p. 173.

{¶ 13} After Williams and R.T. arrived at the hotel, they went into a room that contained three other people: a husband and wife and their son. Tr. at p. 164. R.T. did not feel well and lied on the floor between the two beds in the room. She was throwing up. *Id.* at p. 165 and 174.[1] The woman in the room said R.T. could lie down on one of the beds; after doing so, R.T. dozed off. *Id.* at p.164 and 175. R.T. recalled Williams lying down beside her and that Williams kept putting methamphetamine ("meth") inside

---

[1] When R.T. talked to the police after the incident, she claimed she also threw up out of the car window multiple times on the way to the hotel, due to having unknowingly ingested what she suspected was methamphetamine. R.T. did not testify to this at trial, but the evidence was brought in through the officers' testimony. Tr. at p. 211-212 and 272-273.

her butt and vagina. *Id.* at p. 165. At some point, R.T. took a shower. While she was in the bathroom, Williams tried to have sex with her, pushing her face-down over the toilet. R.T. asked him to stop, but he did not. Williams was doing meth, told her she was no fun anymore, and left the hotel. *Id.* at p. 166-167.

{¶ 14} R.T. then called her friends, Neveah and Alexis, as well as a man who was close to her. She did not call the police. The man came and got R.T., and she left the hotel. *Id.* at p. 168, 175, 179, 187, and 201.

{¶ 15} The call to Neveah and Alexis was on speakerphone. *Id.* at p. 203. According to Neveah, R.T. said she had been raped but did not remember much. R.T. also mentioned to Neveah that someone named "Lo" put a needle in her. *Id.* at p. 189. Alexis testified that R.T. sounded like she was "out of it," like she was under the influence of drugs. Both women said R.T. was crying during the phone call. *Id.* at p. 187-188 and 202. Alexis's account was that R.T. called because she wanted them to come and get her at the hotel. However, Alexis stated that she never found out from R.T. why she wanted them to come. *Id.* at p. 203.

{¶ 16} Neveah and Alexis went to the hotel room number that R.T. had described, but R.T. was not at the hotel when they arrived. Neveah called the police as soon as they got here. Before the police arrived, Neveah and Alexis talked to the three occupants of the room. Tr. at p. 189, 191, and 201. Neveah observed "blood all over the bed and all types of needles and stuff like that in the bathroom." *Id.* at p. 188. After the police came, Neveah talked to R.T. on the phone. During this call, Neveah handed her phone to Springfield Police Officer Joshua Emory, who spoke with R.T. and arranged to meet

her at a Speedway gas station. *Id.* at p. 198 and 209. Emory was a patrol officer who had gone to the hotel to assist other officers. *Id.* at p. 207-208. During this conversation, R.T. said she had taken a shower and had changed her clothes. Emory asked R.T. to bring the other clothes with her. *Id.* at p. 210.

{¶ 17} When Emory arrived at the gas station, he was unable to locate R.T. He then called R.T. at a number she had given him and met her at an empty parking lot north of the gas station. *Id.* at p. 209-210.

{¶ 18} When R.T. appeared, she gave Officer Emory the following account. On January 27, 2021, R.T. was at the Ronez apartment complex, and Williams asked if she wanted to make $200. R.T. told Williams that she did. *Id.* at p. 211. R.T. then got into a car with Williams and an unknown person. They went to a local park where Williams gave her a "bong," which was a glass pipe used for smoking. R.T. thought the pipe contained marijuana and took a hit, but realized the substance was not marijuana. R.T. suspected it was meth. *Id.* R.T. began getting sick immediately, and that is when Williams left the park. As noted, R.T. claimed to have thrown up multiple times out of the car window as they were driving. *Id.* at p. 211-212.

{¶ 19} According to R.T's account to the police, she and Williams went to Room 213 when they got to the USA hotel. Because R.T. was not feeling well, she lied down in a bed. The people in the room were doing doses of meth, and R.T. did a line of meth as well. As R.T. was lying in bed, Williams inserted meth into her vagina and anus with his finger. Shortly after this, a boy in the room got out of the shower; R.T. then asked if she could get in the shower. After going in, R.T. locked the door. At some point,

Williams came into the bathroom, yelled at her for locking the door, and they had a normal conversation. *Id.* at p. 212-213. After R.T. got out of the shower, Williams grabbed her by the neck, bent her over the sink and placed his penis inside her vagina. *Id.* at p. 213.

{¶ 20} Officer Emory decided to take R.T. to the hospital to have a rape kit performed. Tr. at p. 213. A sexual assault nurse then examined R.T. using a sexual assault evidence collection kit. *Id.* at p. 225-226. The exam was conducted at 8:10 a.m. on January 28, 2021, which was several hours after the alleged events occurred. *Id.* at p. 226 and 231-232, and State's Ex. 1. The nurse took swabs from various areas, including the mouth, the fingernails, the outside and inside of the vagina, and the rectal area. She also collected pubic hairs and did a physical exam. *Id.* at p. 224, 228-229, and 230-231. The chain of custody was preserved for the kit, and it was submitted to the Ohio Bureau of Criminal Investigation ("BCI") for analysis. *Id.* at p. 236-238, 246-247, 250-252, 257, and 321, and State's Ex. 3.

{¶ 21} On January 29, 2021, a number of text messages were sent to a contact identified as "Lo Lo" in R.T.'s cell phone. R.T. denied putting Williams in her phone as "Lo" and denied ever contacting him. *Id.* at p. 170-171, and Defendant's Ex. A. R.T. then stated that she did remember some of the text messages. However, she still denied putting Williams's name in her contact list; she claimed that multiple people used her phone. *Id.* at p. 171 and 181. During this text conversation (quoted verbatim), R.T. stated, "Listen man, uk I told u to stop u were hurting. . . ," and "Lo Lo" responded, "Smh I never raped you and u know it." Ex. A at p. 2. R.T. also expressed anger over the fact that "Lo" had brought other girls to the hotel and said, "the thing is I thought you was coo

man." *Id.* There is no evidence of further contact after January 29, 2021.

{¶ 22} An initial BCI report on R.T.'s DNA sample was issued on March 5, 2021. The vaginal samples revealed the presence of R.T.'s DNA and that of an unknown male in sufficient quantity for comparison; the anal samples revealed R.T.'s DNA and additional male DNA, but not enough for a comparison or to really say anything about it. Tr. at p. 321-322 and 324-327, and State's Ex. 8.

{¶ 23} On March 18, 2021, Detective Fent of the Springfield Police Department took a buccal swab from Williams in connection with a different case and submitted it to the BCI. Tr. at p. 274-275, 281-282, and 322, and State's Ex. 4.[2] BCI then did additional DNA testing of R.T.'s DNA and issued a second report on April 13, 2021. Tr. at p. 328-329 and State's Ex. 9. This report showed that the DNA of the unknown male in the vaginal sample was consistent with Williams's DNA, with a statistic ratio of being rarer than one in one trillion unrelated individuals. Tr. at p. 330. This meant that the forensic scientist would have to test more than a trillion other persons who were not Williams's identical twin to find someone also matching that DNA profile. *Id.*

{¶ 24} As indicated, Williams's girlfriend, L.R., was in the car with Williams and R.T. the night of the incident. L.R. testified that they gave R.T. a ride to the USA hotel, where R.T. was to meet a boyfriend, Michael. L.R. saw no evidence that R.T. was ill or

---

[2] The case in question was Clark C.P. No. 2021-CR-369, which involved Williams's girlfriend, L.R., who had called 911 about Williams on March 3, 2021. Tr. at p. 360-370. As a result of L.R.'s complaint, the police obtained a search warrant for Williams's home. They then obtained a search warrant for a buccal swab from Williams. *Id.* at p. 5-8. However, the State later dismissed any charges relating to the incident after L.R. sent a letter to the prosecutor in July 2021 recanting what she had previously said about Williams. *Id.* at p. 9.

acting in a peculiar manner. They arrived at the hotel between 8:00 and 9:00 p.m. Williams went in briefly for about a minute and a half and returned to the car. *Id.* at p. 355-357. Williams then took L.R. home and left to help a friend move a stove. *Id.* at p. 356. L.R. was not with Williams the rest of the evening. *Id.*

{¶ 25} On August 14, 2021, L.R. reached out to R.T. on Facebook. L.R. did this because she had seen R.T. at the grand jury proceedings. L.R. was mad because R.T. was crying and asking, "why me," when R.T. knew that L.R. was Williams's girlfriend. Yet R.T. "was still hanging out with a man who had a girlfriend." L.R. took screenshots of the text conversation. *Id.* at p. 359-360 and Defendant's Ex. B.

{¶ 26} During this text conversation, R.T. told L.R. her side of what had happened at the hotel. Tr. at p. 360. R.T. also told L.R. that she did not have sex with Williams that night in the hotel room and denied that she was pregnant with Williams's child. R.T. sent L.R. a picture of the child's father. *Id.* at p. 362.

{¶ 27} On September 6, 2021, Williams and L.R. had a jail call that was recorded. During the call, L.R. gave the phone to Williams's nephew, Mack, who spoke to Williams. While they were speaking, Williams told Mack to "handle" R.T. *Id.* at p. 301-302, 305, and 363-364, and State's Ex. 7 (Redacted Jail Call # 7). Detective Fent stated that she interpreted handling to mean to "get" to R.T., "have her not show up, to hurt her, whatever it took." Tr. at p. 305. However, Fent was not aware of anything that happened after that call. *Id.* at p. 306.

{¶ 28} After hearing the evidence, the jury found Williams guilty of two sexual battery charges and intimidation of a witness, but not guilty of the rapes, the kidnapping,

and the remaining sexual battery charges. The trial court then sentenced Williams to a total of ten years in prison. Williams timely appealed from his convictions.

## II. Appeal of Clark C.P. No. 2021-CR-369

{¶ 29} Williams's first assignment of error deals with whether an appeal from Clark C.P. No. 2021-CR-369 is properly before us. Again, this case involves charges arising from the March 3, 2021 911 call that Williams's girlfriend, L.R., made to the police. Both parties agree that the dismissal of the indictment in that case is not a final appealable order. We also agree.

{¶ 30} Crim.R. 48(A) provides that "[t]he state may by leave of court and in open court file an entry of dismissal of an indictment, information, or complaint and the prosecution shall thereupon terminate." This type of dismissal is not considered to be a final appealable order, because it does not affect a substantial right. Instead, the defendant is simply placed in the same position he or she occupied before criminal charges were filed. *See, e.g., State v. Williams*, 9th Dist. Summit No. 25384, 2011-Ohio-6412, ¶ 9 and 11.

{¶ 31} A different result could occur if the State were appealing a trial court's dismissal of an indictment. *See State v. Craig*, 116 Ohio St.3d 135, 2007-Ohio-5752, 876 N.E.2d 957, ¶ 16 ("[p]ursuant to R.C. 2945.67(A), the state may appeal the dismissal of an indictment whether the dismissal is with or without prejudice"). Likewise an appeal could proceed if some charges were dismissed and a defendant then appealed convictions on the remaining charges. *See State v. Jackson*, 151 Ohio St.3d 239, 2017-

Ohio-7469, 87 N.E.3d 1227, ¶ 1 ("*any* dismissal of a count in an indictment resolves that count and does not prevent a judgment of conviction from being final and appealable" (emphasis sic.))

{¶ 32} However, neither situation applies here. Instead, the court's dismissal of all charges in Clark C.P. No. 2021-CR-369 left the parties in the same position they occupied before the criminal charges were filed. No substantial right of Williams, therefore, has been affected. Accordingly, there is no final appealable order, and the appeal, insofar as it relates to that case, will be dismissed.

III.   Suppression of Evidence Derived From Buccal Swab

{¶ 33} Williams's second assignment of error states that:

> The Trial Court Erred When It Failed to Suppress All Evidence Derived From the Buccal Swab Where the Affidavit Did Not Meet the Probable Cause Requirements of the Fourth Amendment to the U.S. Constitution and Art. I, Section 14 of the Ohio Constitution.

{¶ 34} Under this assignment of error, Williams sets forth the requirements for deciding sufficiency of probable cause in an affidavit. He further outlines situations where the analysis may be extended beyond an affidavit's "four corners" if a defendant can demonstrate that the affiant "made a false statement intentionally, or with reckless disregard for the truth." Williams's Brief at p. 11-12. Williams then discusses the facts surrounding two search warrants. The first warrant authorized a search of Williams's home, based on the report of his girlfriend, L.R., who had accused him of sexually

assaulting her on March 3, 2021, by inserting a knife into her vagina. *Id.* at p. 12-13. After obtaining a search warrant, the police found the alleged knife along with cut clothing. Based on finding these objects, the police obtained a second search warrant on March 18, 2021, to obtain buccal swabs from Williams. *Id.* at p. 13. This swab was later used in April 2021 to match Williams's DNA to that of R.T., the victim in the present case.

{¶ 35} Williams notes that his argument in the trial court was not that the affidavit contained deliberately false information. Instead, he argued only that the police recklessly placed L.R.'s recanted story into the affidavit. *Id.* at p. 13. After making these points, Williams essentially agrees in his brief that the evidence was sufficient when the affidavit was filed. Williams also does not discuss how the police acted recklessly. *Id.* at p. 13-15.

{¶ 36} Under the Fourth Amendment to the United States Constitution, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "The language of Article I, Section 14 of the Ohio Constitution is virtually identical to the language in the Fourth Amendment, and we have interpreted Article I, Section 14 as affording the same protection as the Fourth Amendment." *State v. Hoffman*, 141 Ohio St.3d 428, 2014-Ohio-4795, 25 N.E.3d 993, ¶ 11, citing *State v. Robinette*, 80 Ohio St.3d 234, 238-239, 685 N.E.2d 762 (1997).

{¶ 37} "Central to the Fourth Amendment is the probable-cause requirement."

*State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶ 34. "In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, [an issuing magistrate's task] * * * 'is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph one of the syllabus, quoting and following *Illinois v. Gates*, 462 U.S. 213, 238-239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *Accord Castagnola* at ¶ 35. Ordinarily, "a probable cause inquiry must be confined to the four corners of the affidavit." *State v. Klosterman*, 114 Ohio App.3d 327, 332, 683 N.E.2d 100 (2d Dist.1996).[3]

{¶ 38} However, "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 155-156, 98 S.Ct. 2674, 57 L.Ed.2d 667. "Furthermore, if the defendant establishes the perjury allegation or reckless disregard by a preponderance of the evidence at the hearing, and if, with the false material set aside, 'the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded

---

[3] There are exceptions, of course. For example, "a court may consider evidence beyond the four corners of a search-warrant affidavit in determining whether an officer reasonably and in good faith relied on that warrant." *State v. Dibble*, 159 Ohio St.3d 322, 2020-Ohio-546, 150 N.E.3d 912, ¶ 1.

to the same extent as if probable cause was lacking on the face of the affidavit.' " *State v. Corwin*, 2d Dist. Montgomery No. 26690, 2016-Ohio-4718, ¶ 21, quoting *Franks* at 156.

**{¶ 39}** " 'Reckless disregard' means that the affiant had serious doubts of an allegation's truth." *State v. Waddy*, 63 Ohio St.3d 424, 441, 588 N.E.2d 819 (1992), quoting *United States v. Williams*, 737 F.2d 594, 602 (7th Cir.1984). *Accord State v. Starks*, 2d Dist. Montgomery No. 28158, 2019-Ohio-2842, ¶ 12.

**{¶ 40}** Here, the trial court held a *Franks* hearing and denied Williams's motion. On review, there is no question that Williams failed to establish reckless disregard. Specifically, the affidavits for both search warrants were filed in connection with L.R.'s March 3, 2021 complaint. At the time, the police had no idea that L.R. would later refute her allegations *several months later*, in July 2021. Williams has not even seriously attempted to argue this point. Accordingly, there was simply no evidence of reckless disregard, and the trial court did not err in overruling the motion. The second assignment of error therefore is overruled.

IV. Sufficiency and Manifest Weight Challenges

**{¶ 41}** Williams's third and fourth assignments of error are combined in his brief and will be considered together. These assignments of error state, respectively, as follows:

The Trial Court Erred in Accepting the Jury Verdict of Guilty as the

Evidence Presented Was Insufficient to Conclude that Guilt Had Been

Proven Beyond a Reasonable Doubt in Violation of the Defendant-

Appellant's Rights to Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 10 and 16 of the Ohio Constitution; and

The Trial Court Erred in Entering a Finding of Guilty Because Such Verdict Was Against the Manifest Weight of the Evidence, Fifth and Fourteenth Amendments, United States Constitution, and Article I, Section 16 of the Ohio Constitution.

**{¶ 42}** The argument under both assignments of error is the same, i.e., that the guilty verdicts on sexual battery were not based on adequate evidence because the State failed to prove that the victim, R.T., was substantially impaired. In this regard, Williams relies on the following points: (1) while R.T. admitted taking meth, this was not corroborated by results from the local hospital or BCI; (2) according to recognized authorities, the effects of meth do not demonstrate a "reduction, diminution, or decrease" in a victim's ability to appraise her conduct's nature or to control her conduct; (3) the nurse who conducted the rape examination stated that she could not tell if R.T. was under the influence of drugs; (4) R.T. forgot she had said she was to be paid $200 and instead told people Williams had raped her; and (5) the symptoms of meth withdrawal are the opposite of the effects of intoxication. Williams's Brief at p. 16-18.

**{¶ 43}** In responding, the State notes that Williams failed to raise this issue in the trial court. State's Brief at p. 5. The State further argues that Williams's contentions are "beyond the pale," because illegal stimulants can impair victims. *Id.* Before addressing these points, we will outline the general standards for assessing sufficiency

and manifest weight of the evidence claims.

## A. General Standards

{¶ 44} "A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law." *State v. Cherry*, 171 Ohio App.3d 375, 2007-Ohio-2133, 870 N.E.2d 808, ¶ 9 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "The proper test to apply to the inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492: 'An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Cherry* at ¶ 9.

{¶ 45} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citation omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency."

*State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 46} In situations involving a manifest weight challenge, a court reviews " 'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene No. 2013-CA-61, 2014-Ohio-3432, ¶ 24, citing *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 14.

{¶ 47} A further important principle is that appellate courts should cautiously exercise their discretionary power of finding that judgments are against the manifest weight of the evidence. This is because factfinders see and hear the witnesses and have unique competence to decide whether, and to what extent, to credit their testimony. As a result, we give substantial deference to credibility decisions of factfinders. *State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501, ¶ 59 (2d Dist.), citing *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

B. Discussion

**{¶ 48}** The State argues that Williams failed to raise the substantial impairment issue in the trial court and waived error concerning this point. When Williams moved for a Crim.R. 29 acquittal after the State rested, he did not mention lack of evidence of substantial impairment as a ground. *See* Tr. at p. 345-346. In responding, the State did briefly mention impairment but did not go into detail. *Id.* at p. 348. The trial court found the State had met its burden and overruled Williams's motion. *Id.* at p. 349.

**{¶ 49}** Typically, unpreserved errors may not be reviewed on appeal. They may be reviewed, however, under the plain error doctrine, which provides that "defects which affect substantial rights may be grounds for reversal even though they were not brought to the attention of the trial court." *State v. Manley*, 71 Ohio St.3d 342, 347, 643 N.E.2d 1107 (1994), citing Crim.R. 52(B). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise." *State v. Moreland*, 50 Ohio St.3d 58, 62, 552 N.E.2d 894 (1990), citing *Long* at paragraph two of the syllabus. (Other citation omitted.)

**{¶ 50}** "In a criminal prosecution, a plea of 'not guilty' requires the state to prove all material facts relating to the crime charged." *State v. Manago*, 38 Ohio St.2d 223, 226, 313 N.E.2d 10 (1974). Furthermore, we have said that "a defendant's 'not guilty' plea preserves the right to object to an alleged insufficiency of evidence, even if the matter is not raised at trial." *State v. Hill*, 2d Dist. Montgomery No. 25274, 2013-Ohio-2016,

¶ 28, citing *State v. Carter*, 64 Ohio St.3d 218, 223, 594 N.E.2d 595 (1992), and *State v. Jones*, 91 Ohio St.3d 335, 346-347, 744 N.E.2d 1163 (2001). *Accord State v. Erby*, 2d Dist. Montgomery No. 27799, 2018-Ohio-3695, ¶ 17; *State v. Ropp*, 2d Dist. Champaign No. 2018-CA-44, 2020-Ohio-824, ¶ 30.

**{¶ 51}** We have also said that "even if a defendant could waive a challenge to the sufficiency of the evidence by failing to raise the issue at trial, it would remain subject to plain-error analysis." *State v. Rochowiak*, 2d Dist. Miami No. 2008-CA-12, 2009-Ohio-2550, ¶ 24, citing *State v. Osterfeld*, 2d Dist. Montgomery No. 20677, 2005-Ohio-3180, ¶ 8. The reasoning is that " ' "a conviction based on legally insufficient evidence constitutes a denial of due process," * * * and a conviction based upon insufficient evidence would almost always amount to plain error.' " *Osterfeld* at ¶ 9, quoting *State v. Coe*, 153 Ohio App.3d 44, 2003-Ohio-2732, 790 N.E.2d 1222, ¶ 19 (4th Dist.), which in turn quotes *Thompkins*, 78 Ohio St.3d at 386-387, 678 N.E.2d 541.[4] Regardless of the standard used, we find no error.

**{¶ 52}** Notably, Williams was not convicted of any of the rape charges, which were brought under R.C. 2907.02(A)(2), which states that "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Williams was convicted of two counts of sexual battery and intimidation (the latter of which relates to an incident occurring months after January 27,

---

[4] Some courts have found the "issue largely academic because a conviction based on legally insufficient evidence constitutes a denial of due process." *State v. Smith*, 10th Dist. Franklin No. 08AP-736, 2009-Ohio-2166, ¶ 25. *See also State v. Jackson*, 3d Dist. Allen No. 1-19-83, 2020-Ohio-5224, ¶ 12. Any differences in approach are irrelevant, however, because Williams's challenge fails whether we review it either under plain error or traditional standards relating to sufficiency of the evidence.

2021).

{¶ 53} The alleged sexual battery crimes were violations of R.C. 2907.03(A)(2), which provides, in pertinent part, that "No person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired."

{¶ 54} "Sexual conduct" is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).

{¶ 55} Because the Ohio Revised Code has not defined the term "substantially impaired," it "must be given the meaning generally understood in common usage." *State v. Zeh*, 31 Ohio St.3d 99, 103, 509 N.E.2d 414 (1987). Thus, "substantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct." *Id.* Expert testimony is not needed to prove substantial impairment; " 'it may be proven by the testimony of persons who have had some interaction with the victim and by permitting the trier of fact to obtain its own assessment of the victim's ability to either appraise or control her conduct.' " *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 21 (2d Dist.), quoting *State v. Dorsey*, 5th Dist. Licking No. 2007-CA-091,

2008-Ohio-2515, ¶ 43. "Furthermore, voluntary intoxication is a 'mental or physical condition' that could cause substantial impairment * * *." *Id.*, quoting *State v. Harmath*, 3d Dist. Seneca No. 13-06-20, 2007-Ohio-2993, ¶ 11.

{¶ 56} In the case before us, ample evidence existed of R.T.'s intoxication, both voluntary and involuntary. Viewing the evidence in a light most favorable to the prosecution, any rational fact-finder could have found beyond a reasonable doubt that R.T. was substantially impaired. First, R.T. voluntarily drank alcohol and smoked marijuana before arriving at the hotel. She also voluntarily took a hit of what she thought was marijuana but which appeared to be meth. R.T. had an immediate reaction, vomiting multiple times out of the car's side window, and Williams observed this.

{¶ 57} After arriving at the hotel, R.T. vomited again while lying on the floor. She had clearly experienced a reduction or decrease in her ability to control her conduct at that point. By her own admission, R.T. used meth again, which was voluntary. While R.T. dozed on the bed, Williams inserted more drugs into R.T.'s body. Whether R.T. was dozing, had passed out, or was partially awake, she did not ask Williams to place meth inside her body, meaning that this ingestion of drugs was involuntary.

{¶ 58} Furthermore, although R.T. was able to get up and take a shower and have "normal conversation" briefly, this does not mean she was not substantially impaired. In fact, when R.T. called her friends right after these incidents, she showed obvious signs of intoxication, being "out of it" and under the influence of drugs. Tr. at p. 202. Williams was in a position to see this and, in fact, caused the intoxication in part.

{¶ 59} In arguing that R.T. was not substantially impaired, Williams notes that the

nurse who performed the rape examination could not tell if R.T. was intoxicated. The nurse described R.T. as being "very tearful, just kind of like flight of ideas, like she couldn't stay on one topic for too long, just kept saying she was tired, she just wanted to sleep." Tr. at p. 234. According to the nurse, R.T. said she was "going to fall asleep now," and was "seeing black floating things." As a result, R.T. was unable to complete her statement. *Id.* at p. 235. The nurse also said she could not tell whether R.T. was under the influence of drugs. *Id.* at p. 241. In this regard, the nurse commented that R.T. was "just very distraught, so I didn't know what that was from. I was assuming it was from the assault." *Id.*

{¶ 60} The jury could have reasonably given little weight on the nurse's statement, as her examination took place hours after the incident, during which time signs of intoxication or impairment may have subsided. The time frame R.T. gave the nurse was 10:19 p.m. on January 27, 2021, to 3:00 a.m. on January 28, 2021, and the exam took place around 8:10 a.m. on January 28. *Id.* at p. 231-232 and State's Ex. 1. Therefore, between five and 10 hours had elapsed. R.T. told the nurse that she was not really sure on the time frame "because she had been using drugs and she hadn't slept and she couldn't remember a whole lot, but she remembered when she got to where she was at and when she woke up." *Id.* at p. 231.

{¶ 61} Courts have commented that a more difficult question is whether the defendant knew the alleged victim was substantially impaired. *Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, at ¶ 23. *See also State v. Jenkins*, 2d Dist. Greene No. 2015-CA-6, 2015-Ohio-5167, ¶ 27.

{¶ 62} " '[W]hen reviewing substantial impairment due to voluntary intoxication, there can be a fine, fuzzy, and subjective line between intoxication and impairment. Every alcohol consumption does not lead to a substantial impairment. Additionally, the waters become even murkier when reviewing whether the defendant knew, or should have known, that someone was impaired rather than merely intoxicated.' " *Hatton* at ¶ 23, quoting *State v. Doss*, 8th Dist. Cuyahoga No. 88443, 2008-Ohio-449, ¶ 18.

{¶ 63} If one accepts R.T.'s testimony that she threw up multiple times while in Williams's car and threw up in the hotel, after which she ingested even more meth both voluntarily and involuntarily, there was sufficient evidence to support the conclusion that Williams knew R.T. was substantially impaired at the time of the sexual battery.[5] No error or plain error occurred in this regard. Again, even if Williams failed to properly raise the impairment issue, sufficient evidence existed to support the convictions.

{¶ 64} Williams has also remarked on R.T.'s statement that she wanted to make $200, implying that she willingly agreed to go with him and to engage in sexual activity. However, this has nothing to do with whether R.T. was substantially impaired or whether Williams knew of it at the time of the battery. This would be more of a factor in considering whether the verdict were against the manifest weight of the evidence.

{¶ 65} As noted, reversing on the manifest weight of the evidence is done in " 'exceptional cases,' " and involves reviewing the entire record, weighing evidence and

---

[5] There was some evidence that R.T. also used fentanyl, perhaps without her knowledge. R.T. told the police that people in the room were using fentanyl, but she did not want any part of it. Tr. at p. 212. However, R.T. also told her friend that Williams had put a needle in her. *Id.* at p. 191. She also testified that the doctors told her meth and fentanyl were in her system. *Id.* at p. 173.

all reasonable inferences, as well as considering witness credibility to decide if "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Williams did not waive error in this regard, at least with respect to appellate consideration of a manifest weight challenge.

{¶ 66} In *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, the Supreme Court of Ohio rejected the position that parties waive the ability to assert a manifest weight challenge on appeal if they fail to file motions for new trial (which test the weight of the evidence). *Id*. at ¶ 24-30. Relying on R.C. 2321.04, the court held that "[n]othing in the rules or statutes requires a party to have made a particular motion before seeking appellate review of a jury verdict on the weight of the evidence." *Id*. at ¶ 28-29. This statute provides that "[a] motion for a new trial is not necessary as a prerequisite to obtain appellate review of the sufficiency or weight of the evidence submitted to the trial court where such evidence to be considered appears as a part of the record filed in the appellate court."

{¶ 67} Although *Eastley* was a civil action, the court noted that the criminal code contains a "corresponding statute." *Eastley* at ¶ 28, fn. 4. This statute, R.C. 2945.831, provides that "[a] motion for a new trial is not a necessary prerequisite to obtain appellate review of the sufficiency or weight of the evidence in the trial of a criminal case." Thus, similar considerations apply here.

{¶ 68} In reality, however, the issue concerns whether Williams presented evidence on his view of the substantial impairment issue at trial. He did not. Williams

argues that the effects of meth contradict "a present reduction, diminution, or decrease in the victim's ability, either to appraise the nature of her conduct or control her conduct as required." Williams's Brief at p. 16. Specifically, Williams is contending that the effects of meth do not meet the definition of "substantial impairment" as outlined in *Zeh*, 31 Ohio St.3d at 103, 509 N.E.2d 414. As support for this point, Williams refers to various publications discussing short and long-term effects of meth. Williams's Brief at p. 16-18.

**{¶ 69}** Under well-established law, "[a] reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus. If Williams wished to challenge impairment based on the "effects" of meth, he should have presented expert testimony at trial. He chose not to do so, and he cannot rely here on various publications to support his argument.

**{¶ 70}** We have reviewed the entire record and find this case lacks exceptional circumstances that would justify overturning the verdict to avoid a miscarriage of justice. The evidence of record supported the convictions, and the jury, which saw and heard the witnesses, chose to believe the State's witnesses, including R.T., even though there may have been some inconsistencies in testimony. As noted, credibility decisions "are primarily for the finder of fact." *Jenkins*, 2d Dist. Greene No. 2015-CA-6, 2015-Ohio-5167, at ¶ 30. Accordingly, the judgment was not against the manifest weight of the evidence. Moreover, Williams's acquittal on several counts supports the conclusion that the jury was able to weigh the evidence. *See State v. Redic*, 2d Dist. Greene No. 2019-

CA-1, 2019-Ohio-3395, ¶ 28.

**{¶ 71}** Based on the preceding discussion, the third and fourth assignments of error are overruled.

## IV. Conclusion

**{¶ 72}** All of Williams's assignments of error in Clark C.P. No. 2021-CR-592 having been overruled, the judgment of the trial court in that case is affirmed. The appeal from the dismissal of all charges in Clark C.P. No. 2021-CR-369 is dismissed for lack of a final appealable order.

. . . . . . . . . . . .

DONOVAN, J. and LEWIS, J., concur.

Copies sent to:

Ian A. Richardson
Steven H. Eckstein
Hon. Douglas M. Rastatter