[Cite as *State v. Cherry*, 2024-Ohio-5344.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Appellee | : | C.A. No. 2024-CA-2 |
| v. | : | Trial Court Case No. 23-CR-677 |
| ASHANTI AKINTUNDE CHERRY | : | (Criminal Appeal from Common Pleas Court) |
| Appellant | : | |
| | : | |

· · · · · · · · · · ·

O P I N I O N

Rendered on November 8, 2024

· · · · · · · · · · ·

ALANA VAN GUNDY, Attorney for Appellant

ROBERT C. LOGSDON, Attorney for Appellee

· · · · · · · · · · · ·

HUFFMAN, J.

{¶ 1} Ashanti Akintunde Cherry appeals his convictions of kidnapping, felonious assault, and having weapons while under disability, along with firearm specifications associated with the kidnapping and felonious assault offenses. contained firearm

specifications.   Cherry was found not guilty of strangulation and tampering with evidence.

{¶ 2} For the reasons that follow, the judgment of the trial court is affirmed.

**Procedural History**

{¶ 3} According to the State, in September 2023, J.S. was badly beaten by Cherry because he believed she had cooperated with law enforcement officers by wearing a "wire" during some of their conversations; the offenses occurred in a trailer where Cherry resided in Springfield.   In October 2023, Cherry was indicted for kidnapping, felonious assault, abduction, strangulation, having weapons under disability, and tampering with evidence; the counts of kidnapping and felonious assault included firearm specifications.

{¶ 4} Cherry was tried by a jury in November 2023.   He was found guilty of kidnapping, felonious assault, abduction, having weapons under disability, and the firearm specifications; he was found not guilty of strangulation and tampering with evidence.   The trial court merged the kidnapping and abduction counts, and the State elected to proceed to sentencing on the kidnapping.   The court sentenced Cherry to an indefinite prison term of 10 to 15 years for kidnapping, an indefinite term of six to nine years for felonious assault, and 30 months for having weapons while under disability, all to be served consecutively.   The court ordered mandatory terms of three years each on the two firearm specifications, to be served prior to and consecutively to the other sentences.   The aggregate sentence was 24.5 to 29.5 years.   The court also designated Cherry as a violent offender under R.C. 2903.41.

{¶ 5} Cherry raises four assignments of error on appeal.   Before addressing them, we will review the testimony of the witnesses at trial.   We will refer to some of the

witnesses by their first names only or by initials to shield their identities.

Christy S.

{¶ 6} Christy S. testified that she had known Cherry her entire life. She was with him on September 29-30, 2023, at the trailer where he lived, which was parked behind a house on Clifton Avenue in Springfield. On September 29, 2023, she drove Tyson W. and his girlfriend to the trailer to buy drugs from Cherry. Tyson went inside the trailer while Christy and Tyson's girlfriend waited in the car. Christy then went inside to ask Cherry if he wanted to trade a navigation system she had for some drugs and money; he agreed to "take a look at it" after she took Tyson home. Christy then drove Tyson and his girlfriend to Race Street, dropped them off, and returned to Cherry's trailer with her boyfriend, Mike, to discuss the potential swap of the navigation system with Cherry.

{¶ 7} Cherry was watching videos when Christy returned; she lay down beside him, "cuddled," and watched videos with him while Mike waited in the car. Mike began texting Christy. Cherry "didn't feel comfortable" with Mike's being right outside Cherry's house, and Cherry did not like Mike, so Christy told Cherry she was going to drive Mike somewhere else.

{¶ 8} Christy intended to return to the trailer immediately, but she and Mike argued and he "put his hands on" her at a Quality Inn where she had taken him, grabbed her by her hair, and tried to take her keys. Christy ran to the hotel lobby and called the police. When she returned to her car, Mike and his belongings were gone, and her car would not start because Mike had unhooked the battery. Christy was able get her car started as

the police arrived, and she left without speaking to them to return to Cherry's trailer. Christy testified that she was addicted to fentanyl and had used some earlier in the day.

{¶ 9} When Christy arrived at the trailer for the third time, J.S. was there. According to Christy, J.S. "had blood on her," and Cherry told J.S. not to look at Christy because "she ain't gonna . . . save you."  Christy then told J.S., "Yeah, I ain't gonna . . . save you."  Christy said this because Cherry had a gun in his hand, and he was yelling at J.S. and hitting her; J.S. had "blood coming down" from being previously hit by Cherry. Christy saw Cherry hit J.S. multiple times. Christy could not identify the gun specifically, but she testified that it was black and was not a revolver.

{¶ 10} Cherry told Christy that J.S. had "wore a wire" on him, although J.S. repeatedly denied doing so while Cherry continued to hit her with the gun.  J.S. finally said, "Okay, I did it," and Cherry said, "See, I told you."  Cherry continued to question J.S., who was "stunned" and "didn't even know nothing about no controlled buys, no wire, no nothing."  Cherry made J.S. get onto the floor, and he ordered Christy to get a "plastic wrap" that was under his bed.  Cherry said that he "didn't want the blood to splatter everywhere" because he said he "was gonna kill" J.S.  Christy retrieved the plastic wrap because she wanted to "stay out the way, stay out the business."

{¶ 11} Cherry then began hitting J.S. with an "1800 bottle" of tequila.  He "just kept telling her, like, that she was gonna die and he was gonna kill her."  Cherry also threatened to kill J.S.'s , daughter, mother, and the people closest to her, while J.S. repeatedly denied that she had informed on Cherry.  According to Christy, "the more that she talked, the more that he hit her with it and it was quite often because she just kept

pleading to him that she did not do it and he repeatedly kept hitting her." Cherry beat J.S. "for like 12 hours," and J.S. "was about gone. She came there full of life and she was leaving with none." Christy did not believe J.S. would survive.

{¶ 12} Christy testified that earlier, while she was at the trailer before J.S. arrived, Cherry had been drinking alcohol with a couple of his friends, and there were "other drugs involved. He had a plate with drugs on it" as well as a "xanny bar." Christy stated that Cherry was under the influence.

{¶ 13} According to Christy, Cherry tied a cord around J.S.'s hands "and around her neck and around his hand and while he was like sleeping." Wherever Cherry went, "he had her with him." If J.S. moved, Cherry struck her. Christy noticed that J.S. was drifting in and out of consciousness.

{¶ 14} At some point during the night, Christy left the trailer to seek help from her boyfriend Mike. She told Mike what had happened to J.S., and that she had "left to go get food" and didn't have much time because J.S. "might already be dead." Mike told Christy to call 911, and she did so. Christy picked up Jaeda K., Cherry's girlfriend, and brought her to the camper because Cherry "wanted his baby, he needed his wife," because he was "real upset." When Christy returned, J.S. was "laying on the ground in a pile of blood." J.S. told Jaeda that she had not done anything wrong. Cherry hit J.S. and told her to shut up. Jaeda said to Cherry, "Baby, you know you can't let her go, you know you got to kill her," and Cherry responded, "I know."

{¶ 15} Christy testified that she "wasn't directed to clean anything up" in the trailer, but she did so anyway because blood was "getting everywhere" and she "was there

making money.   The blood was in [her] way."   Christy cleaned up the blood with "dirty towels that [Cherry] had around and some spray."   According to Christy, J.S.'s blood was "clumpy," and Cherry looked at J.S., "started laughing like an evil laugh," and said, "this is my favorite part.   It's clumpy.   That means you're almost dead."

{¶ 16} Christy, Jaeda, and Cherry went into the bedroom of the camper while J.S. remained on the floor.   When asked if she did anything to help J.S., Christy stated that she "took part of my meal and I fed it" to J.S. while Cherry was "going in and out of sleep." According to Christy, J.S. was "dope sick" or feeling very ill; Christy was smoking fentanyl, which she described as "kind of a medicine," and she pretended to be "nodding out" while really she was bending over to let J.S. have hits of "the stuff to make her feel better because she was done for, like she was in a lot of pain," and "all her head being split open and everything."

{¶ 17} Christy heard footsteps outside the trailer and knew that the police had arrived. Officers knocked very loudly three times, and Cherry tried to push J.S. into the bathroom, while Christy told J.S. to "holler [for] help."   Realizing that they were in trouble and not wanting Cherry to go to jail, Jaeda grabbed a knife and tried to cut the cords off of J.S. "to make it look like she wasn't just held hostage."   Christy "grabbed [J.S.] up and . . . grabbed [Jaeda] by the back of her hair and I ran out the door with them," pushing Cherry out of the way.

{¶ 18} Christy visited Cherry in jail, and he asked her to recant her statement to the police and say that "the detectives schooled me on what to say."   Christy testified that she told the detectives the truth about everything that had happened.   Christy

wanted to be honest at trial "in front of [Cherry]," because he was important to me, but she also didn't want J.S.'s daughter to grow up without J.S. When asked if she did anything to let J.S. know that law enforcement had been contacted while waiting for the police to arrive, Christy stated that she wrote a note back on a notebook "Calm down, just chill, I called the police, they're on their way."

## J.S.

{¶ 19} J.S. was 33 at the time of trial. She testified that she had two children. She had known Cherry for two years, having met him through her husband. J.S. stated that she was addicted to fentanyl and bought her drugs from Cherry. On the date of the incident, J.S. went to Cherry's trailer with two other people, Jarrett and Cheyenne. J.S. remained outside while Jarrett and Cheyenne went in to speak to Cherry. After 30 minutes or so, Jarrett told J.S., who was ready to leave, to come inside. Cherry accused J.S. of having worn "a wire" on him, but she denied having done so. Cherry kept asking her, "what did they tell you about me," but she didn't understand what he was saying because she stayed at home with her daughter all the time. Cherry hit J.S. "in the head a couple times with a pistol," and he told J.S. that he would "make sure [she] wasn't going home to [her] daughter that night" and that he was going to kill her. J.S. tried to leave, but Cherry pulled her back. He also hit her in the head with the tequila bottle, which caused her to get five staples in her head.

{¶ 20} J.S. estimated that she was in the trailer for nine hours. She finally told Cherry that she had worn a wire after he repeatedly questioned her, although she had not

done so, because she wanted him to leave her alone. Cherry told Cheyenne to "get plastic" and had J.S. put it behind her, so when he shot her, "the blood wouldn't splatter all over the place." Cherry tied J.S. up with cords, with one around her neck and the other around her hands behind her back. J.S. "started to feel funny" because of blood loss from her head, and Christy began to clean up the blood. Christy also gave J.S. some food and fentanyl, and she wrote a note to J.S. that police had been notified.

{¶ 21} When Cherry's girlfriend, Jaeda, arrived, J.S. "tried to tell her that it wasn't me that snitched on him, and she kicked me in the face." When the police arrived, Cherry made J.S., Christy, and Jaeda go into the bathroom. When officers knocked on the door, Christy opened it, they went outside, and J.S. got into an ambulance and was transported to the hospital. She testified that she did not think she was going to survive or see her daughter again. J.S. identified multiple photos of the injuries caused by Cherry, and she testified that the injuries were not present when she had arrived at his trailer.

{¶ 22} J.S. testified that Phillip, a former boyfriend of hers, gave her a letter he had written for J.S. to copy in her own handwriting before trial. She identified a portion of the letter that she did copy, and she acknowledged that it stated that Cherry had been wrongfully incarcerated. Phillip also arranged for J.S. to speak to Cherry on the phone, and Cherry made promises to her in exchange for her copying the letter. She began to copy the letter because she believed doing so "would save me some harm," and she wanted her daughter to be safe. J.S. also identified a message Jaeda posted on Facebook Messenger asking J.S. to get in touch with her.

Sergeant Wildeman

{¶ 23} Sergeant Anna Wildeman of the Springfield Police Department was dispatched to Cherry's trailer on an anonymous 911 call regarding a victim being held hostage who had been badly beaten. The caller requested that the report not be broadcast over the police radio because it could be "tracked." Dispatch also reported another anonymous call from a person claiming to be the first caller's boyfriend, which confirmed the initial report.

{¶ 24} Wildeman responded with multiple officers to the trailer. When they arrived, the door was ajar; the officers ordered the occupants outside but got no response. When the officers approached the door, it was slammed shut and locked, and then it "popped" back open. Christy, J.S., and Jaeda came out of the trailer. J.S. had been beaten "really, really badly"; she had "a big gash" on her head and her hair was "matted with blood." J.S. told Officer Wildeman that she was queasy and dizzy. Officer Devore placed J.S. in a cruiser and called an ambulance. Wildeman subsequently entered the trailer with other officers and took Cherry into custody without incident. Wildeman stated that, when the officers first arrived at the trailer, Cherry had said to them: "I want to go back to sleep, there's nobody in here."

### Officer Holbrook

{¶ 25} Officer Trenton Holbrook of the Springfield Police Department responded to the trailer, noticed the door was ajar, and notified Wildeman, who was his supervisor. He and Officer Devore announced their presence, and Cherry opened the door and began speaking to the officers. The officers ordered him to come out, and Cherry slammed the door shut. Cherry stated that no one was there, said he was going back to sleep, and

asked the officers to leave. Then three three women exited the trailer. Thereafter, Wildeman entered the camper with a shield, with Holbrook behind her. Holbrook took Cherry into custody. Cherry stated that no one had been held in the trailer and the women had been free to leave.

Officer Warnock

{¶ 26} Officer Brad Warnock of the Springfield Police Department testified that he had responded with approximately eight officers to Cherry's trailer on September 30, 2023, on the report of a hostage there who was seriously injured. When the women exited the trailer, Warnock observed that J.S. had "severe facial bruises" and that Christy's demeanor was frantic; Christy was "very upset" while describing to Officer Barger what had occurred in the trailer overnight. Officer Devore removed J.S. from the scene.

{¶ 27} Warnock recorded Christy's conversation with Officer Barger. The video of the interview showed Christy outside on a sidewalk, visibly upset, placing her head in her hands, spinning around in circles, and repeatedly wiping her eyes. There was initially no audio, but then Christy could be heard responding to Officer Barger's questions in a distraught manner while crying. She stated that she had obtained a plastic sheet for Cherry and that Cherry had had zip ties. Christy stated that Cherry had dragged J.S. to the hallway and repeatedly beat her and told her he was going to kill her. According to Christy, Cherry had been drinking and had "popped a Xanax." She stated that the bottle of Tequila and the gun with which Cherry had hit J.S. were in the trailer, and she offered to show officers their location. Jaeda's voice could be heard in the background and was

identified by Warnock; Jaeda was saying that J.S. had told them that she had been "jumped" and that J.S. had already been injured when she arrived at the trailer. Warnock testified that Jaeda's statement that J.S. had been been jumped was "[n]ot particularly" consistent with statements she made during a later interview with law enforcement officers. Warnock testified that Christy's statements were consistent with what he observed at the scene.

### Detective Fent

{¶ 28} Detective Sandy Fent of the Springfield Police Department testified that she had been the lead investigator on Cherry's case and had helped obtain a search warrant for Cherry's trailer on September 30, 2023. She initially went to the trailer to view the scene and then proceeded to the hospital to see J.S. At that time, J.S. was "in and out of sleeping and consciousness." During their brief conversation, which Fent recorded, Fent acknowledged J.S.'s visible injuries, and J.S. identified Cherry as her attacker.

### Officer Devore

{¶ 29} Officer Douglas Devore was on routine patrol when he was dispatched to Cherry's trailer on the report of woman who was being held captive and who had been beaten and "was possibly near death." He testified that he, Holbrook, and Wildeman used an alley to gain access to the trailer, and they and other responding officers approached the trailer from "different angles." When officers initially asked Cherry to come out and speak to them, identifying themselves as Springfield Police, he responded, "Hell no" and slammed the door shut. Three women then emerged; Devore stated that "they came out as a group, huddled down, hunched down, and moved in a scurrying

fashion." Devore noticed J.S.'s condition and approached her. She was not "actively bleeding," and the blood had coagulated. She stated, "Thank God, thank God; I didn't think I was gonna get out of there." Devore put her in the back of his cruiser and backed down the alley onto Limestone Street.

{¶ 30} Devore described J.S. as having had "matted, dried, and congealed blood in her hair," and he assumed she had some type of head injury. He requested an ambulance to meet him on Limestone Street and followed it to the hospital. Devore spoke to J.S. in the cruiser before the ambulance arrived, and she provided her mother's phone number for him to call. At the hospital, he worked with hospital staff to gather J.S.'s clothing, noting that J.S. "was in no condition to walk, let alone take clothes on and off." Devore stated that J.S. was very small in stature and weighed approximately 90 pounds. After hospital staff assessed her injuries and put her in a gown, Devore took photos of J.S.'s injuries, her a blood-soaked sweatshirt, and her blood-soaked black shirt. He also spoke to her at the hospital.

{¶ 31} On cross-examination, Devore acknowledged that he did not know when or where J.S. had received her injuries, but he reiterated that J.S. had said in the cruiser that Cherry "beat her" and held her "captive"; she did not describe what had happened specifically. Devore testified that their conversation had occurred about 15 minutes after J.S. exited the trailer.

Sergeant Pergram

{¶ 32} Sergeant Doug Pergram, a crime scene investigator with the Springfield Police Department, testified that Cherry's trailer had been secured while officers worked

to obtain a warrant to search the trailer. The warrant was issued after about two and a half hours. Then, Pergram took exterior and interior photos of the trailer, which he identified at trial. He testified that the trailer had been "extremely dirty and unkempt." He identified photos of a zip tie on a table, a large bottle of tequila, an ammunition box, and a rifle with a magazine and bullet behind a plastic set of drawers. Pergram stated that he had tested the rifle and found it to be operable.

**{¶ 33}** Pergram had also photographed black phone cords that were tied together in the mid-section of the trailer and suspected blood on the hallway floor near the bathroom, and he identified these photos at trial. He testified that blood samples had been collected. Pergram also identified photos of a black pistol retrieved from Cherry's bed, including a photo that showed the gun had a loaded magazine; an additional magazine was also found in the trailer. Pergram learned where the gun would be found from detectives who had spoken with J.S. Pergram testified that testing established that the gun was operable.

**{¶ 34}** Pergram also identified a photo of a pile of trash outside the trailer because he had learned that a bottle used in the incident would be located there. The photo depicted bloody rags. Pergram also identified a photo of a bottle of vodka with suspected blood visible on the label, a sheer plastic drop cloth that had been removed from the trailer, a package of black zip ties, and a receipt from McDonald's dated September 30, 2023.

Logan Schepeler

**{¶ 35}** Logan Schepeler, a forensic scientist in the DNA section of the Ohio Bureau

of Criminal Investigation, was qualified as an expert in DNA, having examined thousands of pieces of evidence for DNA. He had examined and prepared a report about a DNA standard from J.S., four swabs from blood stains and cords that were bound together in Cherry's trailer, and a DNA standard from Cherry. J.S.'s blood was found on a swab taken from the trailer and on the cords, and Cherry was the major contributor to a mixed sample found on a bottle of tequila.

### Officer Massie

{¶ 36} Justin Massie of the Springfield Police Department was an investigator in the crimes against persons unit. He testified that he had interviewed Cherry on September 30, 2023, after speaking with Christy and Jaeda; the interview was recorded. In the portion of the video played for the jury, Cherry stated that he and others had been sleeping in the trailer when J.S. arrived with her injuries; he did not know what time she had arrived or how she had been injured. Massie testified that there had not been any calls from the trailer that night for medical assistance prior to Christy's call. Cherry was read his rights and acknowledged his understanding of those rights.

### Detective Melchi

{¶ 37} Detective Brian Melchi of the Clark County Sheriff's Office testified that his responsibilities included retrieving and providing recorded jail calls and video visits when requested by the courts, attorneys, or the public. He had complied such materials for Cherry's phone calls and video visits at Det. Fent's request.

### Detective Fent

{¶ 38} Fent testified a second time at the end of trial, focusing on her investigation

of Cherry's jail calls, messages, and recorded jail visits subsequent to his arrest. Prior to playing the numerous recorded calls for the jury, the court cautioned the jury that the recordings contain other voices in addition to Cherry's; jurors were instructed to disregard what any other individual said and "only use that for the context" of what Cherry "may or may not be saying."

{¶ 39} The jury heard a portion of a call from October 5, 2023, between Cherry and Jaeda, in which Jaeda told Cherry that J.S. was "out." Cherry stated that someone needed to speak to J.S. "about telling the truth" and that "some good things [would] happen" for J.S. if she recanted her story. Jaeda responded, "I got you."

{¶ 40} In several phone calls between Cherry and Jaeda, the name "Anthony" was mentioned. For example, Cherry stated in one of the calls that he owned his own tree business and that "Anthony" would be "okay" because he could help Cherry run the business and "have a job." Detective Fent explained that "Anthony" was the name of J.S.'s husband, who was in jail at the time of the calls; based on the facts that Anthony was in jail (and therefore could not work for a tree service company) and that Cherry and Jaeda used the pronoun "she" and other female references in several calls, investigators surmised that Cherry and Jaeda were really referring to J.S. when they discussed "Anthony" on the calls.

{¶ 41} In an October 6, 2023 call, Cherry and Jaeda discussed a "note," and Cherry told Jaeda to "get it notarized." On the same day, a text message was sent from Cherry's account at the jail; according to Fent, the message was sent form Cherry to a woman known as "Noodles," who was the mother of some of Cherry's children. The

message stated in part, "So please listen.   This is very important.   My tree business, I been needing a bomb ass climber.   Well, my dude, and he climbs and he's a beast, so I'm trying to lock him in to only work for me.   He be working for Haley's, but they was doing him dirty and hardly letting him climb.   Well, he'd be my sole climber, and I'm willing to give him an advance to be committed only to Cherry Picker's Tree Care."   The message further stated, "please help Jaeda handle this. Very important on getting my business back up and running," and "If I can get dude to be working . . . and be loyal to Cherry Pickers Tree Care, I see a real nice future knowledge.   From the God."   Fent testified that "the God" was one of Cherry's nicknames.

{¶ 42} In another October 6, 2023, call between Cherry and Jaeda that was played for the jury, Jaeda stated that "somebody said" three sheriffs had been seen sitting outside Cherry's trailer.   Cherry told Jaeda to avoid the trailer or "move discretely" if she did go there, because law enforcement may "be trying to get [her] subpoenaed to come to court."

{¶ 43} In October 8, 2023 call between Cherry and his brother, Cherry used the phrase, "no face, no case," and he stated that he "didn't do shit."

{¶ 44} In an October 10, 2023 call between Cherry and "Noodles," Cherry asked if "anybody got a hold of Anthony" and further stated that "ain't nobody doin' nothing." Noodles stated that Cherry's brother "is supposed to holler at him," and that she was "putting [Cherry's] brother on it."   Cherry stated that "shit should be taken care of" and that he had "set everything out as smooth as can be."   In another call on the same day between Cherry and Jaeda, Jaeda told Cherry that she could not "find her on Facebook," and Cherry immediately corrected her, stating "him."   Cherry then stated that his

preliminary hearing had been moved to the following day, and he advised Jaeda to "stay away" from the trailer.

{¶ 45} Cherry and Jaeda again talked by phone on October 11, 2023, and a recording of that call was also played for the jury. Jaeda told Cherry that Christy had "flipped" on him and was the one who had called the police the night of the incident. Cherry told Jaeda to put the "truth" in "the paper," to "write it out, find her and get it notarized." He stated, "none of that bull shit has happened." In another call the same day, Cherry told Jaeda that he had been indicted and that he was not coming home "without that paperwork" from J.S.

{¶ 46} In an October 22, 2023 call between Cherry and someone Fent identified as Phillip, Phillip advised Cherry that he had found "the paper" Cherry was looking for, and he asked Cherry what he should do with it. Cherry stated that it had "to be notarized," and "those accusations are false." Phillip responded that he would "most definitely take care" of it. Cherry stressed that "it's crunch time" and stated, "that's good news to the god [Cherry's nickname]." According to Cherry, notarizing "the paper" would make it "legal tender." In another call on the same day, Phillip stated that "everything is still in motion." Cherry advised Phillip to tell Cherry's daughter to help Phillip with his "transportation issues." Cherry stated that he was "facing 88" and that "the truth will come out when she signs that paper."

{¶ 47} In a call on October 23 between Cherry and Phillip, Cherry stated that if "this shit ain't happened it ain't going to happen." Cherry stated that he would "be a good crutch to lean on" for "them," that "the world [was] theirs," and that "they" would "never

have a worry in the world." According to Cherry, his word was "as good as gold." Later in the call, Phillip passed the phone to a "friend," and a female voice that Fent identified as J.S. stated, "Look, I don't hate you."

{¶ 48} Fent testified that, after she was made aware that Phillip had put J.S. on the phone with Cherry, she heard another call in which Cherry dictated a letter to Phillip that sought to exonerate Cherry by stating that he had been wrongfully accused. Fent immediately proceeded to the home of J.S.'s mother out of concern for J.S.'s safety. When she arrived, Phillip answered the door. Fent asked if J.S. was present, and J.S. came to the door. After speaking with J.S., Fent obtained a handwritten letter purporting to exonerate Cherry, along with a portion of that same letter that J.S. had begun to copy in her own handwriting. J.S. had written: "To whom it may concern, I, [J.S.] would like to set the record straight. On or around about September 30th, 2023 Ashanti Cherry was wrongfully charged and incarcerated." Fent testified that the statement written by J.S. had been copied, nearly verbatim, from the full written statement (State's Exhibit 51) as dictated by Cherry to Phillip in the October 23, 2023 recorded phone call.

{¶ 49} Fent also identified a March 7, 2023 certified indictment charging Cherry with aggravated possession of drugs, which was the basis of the charge for having weapons while under disability.

{¶ 50} As discussed above, based on this evidence, Cherry was convicted of kidnapping, felonious assault, having weapons under disability, and the firearm specifications. He was sentenced to an aggregate term of 24.5 to 29.5 years in prison, including two, three-year consecutive sentences on firearm specifications.

{¶ 51} Cherry asserts four assignments of error on appeal. His first assignment of error states:

COUNSEL WAS INEFFECTIVE FOR FAILING TO FILE A MOTION TO SUPPRESS THE LAW ENFORCEMENT INTERVIEW AND INTERROGATION AS WELL AS WELL AS NOT OBJECTING TO THE PROSECUTOR INTRODUCING NEW EVIDENCE DURING THE DISPOSITION.

Failure to File Motion to Suppress

{¶ 52} Cherry asserts that playing a video of his interview with law enforcement officers at trial was prejudicial to him because he had been interviewed without counsel present, he made "no admissions" during the interview, and he invoked his Fifth Amendment rights. As such, he argues that his attorney should have sought to suppress the video of the interview. According to Cherry, it is "highly possible" that a motion to suppress would have been successful if one had been filed, because the video could have "easily prejudice[d] the jury into believing that he was guilty." The State responds that such a motion would have failed and that, even if it had been granted, the outcome of the trial would not have been different given the overwhelming evidence of Cherry's guilt.

{¶ 53} To prevail on a claim of ineffective assistance of counsel, an appellant must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In other words, Cherry must show that counsel's performance was deficient and that he was prejudiced by the deficient performance. *Id.* at paragraph two of the syllabus. "In

reviewing a claim of ineffective assistance of counsel, '[t]rial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance.' " *State v. Coben*, 2002-Ohio-914, *2 (2d Dist.), citing *State v. Cook*, 65 Ohio St.3d 516, 524 (1992), citing *Strickland* at 687-89. "In addition, the error must be so egregious that counsel 'was not functioning as the "counsel" that the Sixth Amendment guarantees.' " *Id.*, citing *Cook*.

**{¶ 54}** " 'Failure to file a suppression motion does not constitute per se ineffective assistance of counsel.' " *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000), quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). An appellant "must point to evidence in the record showing there was a reasonable probability the result of [the proceeding] would have differed if the motion had been filed or pursued." *State v. Weimer*, 2013-Ohio-5651, ¶ 38 (11th Dist.), quoting *State v. Walker*, 2010-Ohio-4695, ¶ 15 (11th Dist.).

**{¶ 55}** We agree with the State that, given the overwhelming evidence of Cherry's guilt, as discussed in detail under his third assignment of error, ineffective assistance of counsel is not demonstrated in defense counsel's failure to file a motion to suppress.

Failure to Object at Sentencing

**{¶ 56}** In his next argument for ineffective assistance, Cherry asserts that, although the State did not produce any evidence that he was a drug dealer or trafficker, the prosecutor stated at sentencing that Cherry had been involved in dealing narcotics and that a significant amount had been found in his trailer. Specifically, the prosecutor said: "This was a particularly violent series of events all surrounding Mr. Cherry's belief that the victim had worn a wire on him. He is involved in dealing narcotics and there was a

significant amount found in the [trailer] for which he is also now facing charges . . ." According to Cherry, defense counsel should have objected, and it "would be difficult to argue" that this did not prejudice the court against him. Cherry acknowledges that defense counsel did "rebut" the prosecutor's assertion, but he asserts that in failing to object, counsel did not preserve the argument for appeal, and thus Cherry would be required to show plain error. The State responds that the prosecutor's reference to Cherry's involvement in narcotics was "within the permissible scope of information the court could consider during sentencing," and therefore defense counsel's failure to object did not constitute ineffective assistance.

{¶ 57} It is well established in Ohio law that, at sentencing, the trial court may consider information beyond that strictly related to the conviction offense. *State v. Bowser*, 2010-Ohio-951, ¶ 15 (2d Dist.). Here, the evidence at trial established that Christy had initially gone to Cherry's trailer so Tyson could purchase drugs from Cherry. Christy also offered to swap her navigation system with Cherry for drugs and/or money. She testified that Cherry had a "plate of drugs" and a "Xanny bar" in the trailer. J.S. testified she bought drugs from Cherry. Most significantly, Cherry believed that J.S. had "wore a wire" to record him engaged in illegal activity, which resulted in his attacking her. Evidence of Cherry's involvement with drugs was relevant to J.S.'s credibility. Fent offered evidence that Cherry had been indicted for aggravated possession drugs on March 7, 2023, as the basis for the weapons under disability charge.

{¶ 58} We conclude that ineffective assistance of counsel is not demonstrated in this instance. The prosecutor's comments at sentencing were consistent with the

evidence presented, and we cannot conclude that the outcome of the trial would have been different if defense counsel had specifically objected to them.

**{¶ 59}** Cherry's first assignment of error is overruled.

**{¶ 60}** Cherry's second assignment of error is as follows:

THE COURT ERRED BY ADMITTING INAPPROPRIATE HEARSAY EVIDENCE. IN TOTALITY, OVER EIGHT INCIDENTS OF HEARSAY [WERE] OBJECTED TO, OVERRULED, AND WERE PRESENTED TO THE JURY AND THUS, THIS CONSTITUTES AN ABUSE OF JUDICIAL DISCRETION.

**{¶ 61}** Cherry argues that, during trial, defense counsel objected to eight instances of hearsay that were allowed into evidence, which preserved those issues for appeal. The State responds that the evidence contested by Cherry was properly admitted.

**{¶ 62}** The general principle that guides admission of evidence is that all relevant evidence is admissible. *State v. Morris*, 2012-Ohio-2407, ¶ 11, citing Evid.R. 402. To be relevant, evidence must have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. However, "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

**{¶ 63}** Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." "A 'statement' is (1) an oral or written assertion

or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Evid.R. 801(A). Pursuant to Evid.R. 802, hearsay is generally inadmissible, but there are numerous exceptions set forth in Evid.R. 803 and 804. Moreover, certain types of statements are not hearsay pursuant to Evid.R. 801(D).

{¶ 64} Evid.R. 803(1) allows the admission of "present sense impressions" as an exception to the hearsay rule. Present sense impressions are statements "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness. . . ." Evid.R. 803(1). "To qualify as a present sense impression, the statement must be made in close temporal proximity to the event described." *State v. Jackson*, 2002-Ohio-1202, *4 (2d Dist.).

{¶ 65} " 'There is an assumption that statements or perceptions that describe events uttered during or within a short time from the occurrence of the event are more trustworthy than statements not uttered at or near the time of the event.' " *State v. Travis,* 2006-Ohio-787, ¶ 35 (2d Dist.), quoting *State v. Ellington*, 2004-Ohio-5036, ¶ 10 (8th Dist.). The basis for trustworthiness is " 'the spontaneity of the statement, either contemporaneous with the event or immediately thereafter,' " such that " 'the minimal lapse of time between the event and statement reflects an insufficient period to reflect on the event perceived – a fact which obviously detracts from the statement's trustworthiness.' " *Id.*

{¶ 66} An "excited utterance" is another exception to the hearsay rule and is "[a] statement relating to a startling event or condition made while the declarant was under

the stress of excitement caused by the event or condition." Evid.R. 803(2). "For a statement to be admissible as an excited utterance, four prerequisites must be satisfied: (1) the occurrence of an event startling enough to produce a nervous excitement in the declarant; (2) a statement made while still under the stress of excitement caused by the event; (3) a statement related to the startling event; and (4) the declarant's personal observation of the startling event." *State v. Abner*, 2006-Ohio-4510, ¶ 69 (2d Dist.), citing *State v. Taylor*, 66 Ohio St.3d 295, 300-301 (1993). " 'The controlling factor is whether the declaration was made under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection.' " *State v. Crowley*, 2009-Ohio-6689, *5 (2d Dist.), quoting *State v. Humphries*, 79 Ohio App.3d 589, 598 (12th Dist.).

In short, an excited utterance is a spontaneous exclamation made under the stress of a startling event. In contrast, a present sense impression is a statement describing or explaining an event while or immediately after the event is perceived. With present sense impressions, the declarant need not be under "stress of excitement caused by the event or condition," as required for an excited utterance; rather, the primary focus is whether the statement was contemporaneous with the perceived event or condition. With both exceptions, the declarations are admissible unless there is an indication that the statements are not trustworthy.

*Id.*

**{¶ 67}** Finally, Evid.R. 801(D) governs prior consistent statements and admissions by a party-opponent. Pursuant to Evid.R 801(D)(1)(b), if the declarant testifies at trial

and is subject to examination concerning the statement, and the statement is "consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive," the statement is not hearsay. Pursuant to Evid.R. 801(D)(2)(a), a statement by a party-opponent offered against the party is not hearsay.

{¶ 68} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Helke*, 2015-Ohio-4402, ¶ 14 (2d Dist.), quoting *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). Thus, we review the trial court's evidentiary rulings for an abuse of discretion. *Id.* at ¶ 14. To constitute an abuse of discretion, a trial court's action must be arbitrary, unreasonable, or unconscionable. *Ojalvo v. Bd. of Trustees of Ohio State Univ.*, 12 Ohio St.3d 230, 232 (1984).

{¶ 69} With these standards in mind, we turn to the statements that Cherry asserts should have been excluded as hearsay.

911 call by Christy

{¶ 70} The recording of Christy's 911 call was presented at trial, and it is clear from the recording that the call was placed while J.S. remained injured in the trailer and Christy was experiencing stress, believing that J.S. was near death. The call was less than three minutes in length. In it, Christy described a "life and death situation" and stated that J.S. was "half dead" and had been beaten and held captive in the trailer by an "armed and dangerous" Cherry. Christy also advised the dispatcher that Cherry used a police scanner to monitor police radio traffic, and if Cherry were to hear mention of her 911 call over his scanner, he would kill J.S. Christy repeatedly urged the dispatcher to send help

to the trailer.    The trial court did not abuse its discretion in admitting the 911 call, because Christy's statements in the call were made under the stress of a startling event, namely Cherry's repeatedly beating J.S., which Christy had witnessed, and Christy's belief that J.S. was near death.    These statements were properly admitted pursuant to Evid.R. 802(1) and (2).

Recorded Statement of Christy

{¶ 71} Cherry also objected on hearsay grounds to the admission of a video recording made by Officer Warnock of Christy's conversation with Officer Barger.    The State argued that Christy's statements were excited utterances, present sense impressions, and prior consistent statements, and therefore were admissible. After listening to the recording outside of the presence of the jury, the court concluded that the confrontation clause was not at issue, because Christy had been subject to cross-examination and her statement was "offered to rebut an express or implied charge against [her] of recent fabrication or improper influence or motive."    Defense counsel responded that there were "some inconsistencies" between what Christy had said in the recording and what she testified to at trial, and that there were "some additional voices" in the recording which suggested that J.S. had already been beat up when Christy arrived at the trailer.    The court admitted the recording pursuant to Evid.R. 801(D)(1)(b) as a prior consistent statement, and it was played for the jury.

{¶ 72} Cherry asserts that Christy's statement was made to Barger "after the police came and the situation was resolved."    He argues that Christy had already testified before the video was offered into evidence, and therefore it wasn't possible for the

defense "to cross-examine her again." According to Cherry, there were "also additional voices and inconsistent statements on the recording." The State responds that the interview qualified as an exception to the hearsay rule as both a present-sense impression and an excited utterance.

{¶ 73} At the beginning of the video played at trial, Christy was outside the trailer on a sidewalk. Although there initially was no audio, Christy was visibly upset. When Christy could be heard, she was distraught and crying as she told Barger about the incident and implicated Cherry. The trial court reasonably concluded that, like Christy's statements in the 911 call, these statements fell within the present sense impression and excited utterance exceptions to the hearsay rule.

Det. Fent's interview of J.S. at the hospital

{¶ 74} Defense counsel objected to the playing of the three-minute recording of Det. Fent's interview with J.S. at the hospital on the basis of hearsay; in the interview, J.S. identified Cherry as her attacker. In response, the State argued that the recording was a prior consistent statement as to who had caused the injuries, a present sense impression made immediately after J.S. was injured, and that it "[went] to the physical state of the victim" and to the State's version of what had occurred. Defense counsel contended that the prejudicial value of the recording outweighed its probative value. After listening to the recording outside of the presence of the jury, the court allowed it to be admitted "for that very narrow purpose of being a prior consistent statement."

{¶ 75} Cherry asserts on appeal that J.S. had already testified by the time the State sought to admit the video, and he points out that "the situation had been resolved" by the

time J.S. was interviewed.   Cherry further notes that J.S. was "groggy" at the time of the video.   The State argues that the interview was a prior consistent statement which demonstrated that J.S.'s trial testimony aligned with statements she made immediately after the "horrific acts" committed against her and showed the physical condition inflicted by Cherry.   The State further asserts that J.S.'s statements qualified as present sense impressions, as they were "made immediately following the stress-inducing event, with no indication of a lack of trustworthiness," and the statements qualified as excited utterances.

{¶ 76} We agree that J.S.'s statements in the interview were prior consistent statements. J.S. testified at trial that Cherry had beat her repeatedly, and in the video of her statements to Fent, J.S. identified Cherry as her attacker.   The trial court did not abuse its discretion in admitting this video.

Devore's testimony

{¶ 77} Cherry asserts that Devore's testimony regarding J.S.'s statements to him, which he relayed to Fent, constituted "two layers of hearsay," one to Devore and one to Fent.   According to Cherry, if the statements did not fall within a hearsay exception, they should not have been heard at all by the jury, and "what has been heard cannot be unheard."   The State responds that J.S.'s statements in the immediate aftermath of the incident were present sense impressions, "as the ordeal that [J.S.] had endured for many hours had just concluded a mere fifteen minutes prior"; it also argues that the statements qualified as excited utterances.

{¶ 78} Devore spoke to J.S. in the car before the ambulance arrived, and she

provided her mother's phone number to him. He spoke with her again at the hospital. When Devore was asked about the information provided by J.S., defense counsel objected on the basis of hearsay. The court allowed the State to lay a foundation, and Devore stated that J.S. had made the statements at the hospital within approximately 30-45 minutes of leaving the trailer and that she was "just an emotional wreck" at the time. According to Devore, J.S. still appeared to be under the stress of the situation in the trailer. He asked her what happened, and she told him.

{¶ 79} When the State asked what information J.S. had relayed to Devore, defense counsel again objected. The court indicated that it had "not heard any grounds at this point that would support an excited utterance other than that she was still under it." The State asked if Devore had recorded the conversation, and he responded that he had been unable to do so. In response to defense counsel's objection, and the court determined that J.S.'s statement qualified as a present sense impression.

{¶ 80} The trial court did not abuse its discretion. Devore testified that J.S. had implicated Cherry in his cruiser before she was taken to the hospital, within 15 minutes of exiting Cherry's trailer, while she was "[a]bsolutely" under the stress of the hours-long event. At the hospital shortly thereafter, J.S. explained that her visible injuries had been caused by Cherry, and there was no indication that her statements were not trustworthy. The trial court did not abuse its discretion in concluding that the statements made to Devore were present sense impressions.

Cherry's recorded interview

{¶ 81} Defense counsel objected to the State's admission of Cherry's recorded

interview with Det. Massie from September 30, 2023. The trial court allowed the interview to be played pursuant to Evid.R. 801(D)(2) as an admission by a party-opponent.

**{¶ 82}** Cherry argues that he was without counsel at the time of the statement, made no admissions, and invoked his Fifth Amendment rights. As such, he asserts that the interview had no probative value. In response, the State points out that Cherry had indicated that J.S. arrived at his trailer already beaten and that the interview therefore had "significant probative value, as [Cherry] made unsubstantiated claims of not being responsible for the beating while offering no details or further information." We conclude that the trial court did not abuse its discretion in admitting Cherry's statements in the interview, pursuant to Evid.R. 801(D)(2)(a).

Recorded jail calls

**{¶ 83}** While the jury was not present, the State informed the court that it intended to play 14 recorded jail calls that "represent[ed] [Cherry's] attempts to interfere with witnesses by getting them to sign affidavits, sending people to find them, . . . promising them things." Three of the calls pertained to the statement that Cherry dictated to Phillip over the phone; Phillip then tried to get J.S. to copy and sign the statement. Defense counsel objected to the evidence about the calls, arguing that their prejudicial effect outweighed their probative value and that Cherry made no admissions in the calls. Defense counsel asserted that asking someone to prepare a statement doesn't prove whether the statement is true or false and that the State was using the tapes to make Cherry "look bad" in his relationships with Christy and Jaeda. The State responded that

the recordings contained tacit, probative admissions.

{¶ 84} Cherry argues that he objected to the playing of the jail phone calls in which no admissions were made. According to the State, "dictating an affidavit for someone else to sign, responding with silence to accusations of his crimes, and attempting to influence witnesses not to appear," as demonstrated in the calls, were tacit admissions of Cherry's criminal activity.

{¶ 85} The evidence established that, at the start of each jail phone call, a recorded message advised Cherry that the jail calls were being recorded. Nonetheless, on these calls, as discussed above, Cherry sought the assistance of Jaeda, "Noodles," and his brother in locating J.S. and obtaining a statement from her exonerating him. He also advised Jaeda to avoid the trailer to prevent her being subpoenaed. He communicated surreptitiously, identifying J.S. as "Anthony," whose loyalty he sought. He dictated a letter to Phillip for J.S. to copy in her own handwriting, which exonerated Cherry. Cherry suggested that good things would happen for J.S. if she made the exculpatory statement, and he stressed that the statement should be notarized. Cherry stated that he would not be coming home "without that paperwork" from J.S. The trial court did not abuse its discretion in concluding that the statements on the phone calls were admissions by a party-opponent and therefore admissible under Evid.R. 801(D)(2)(a) as substantive evidence of Cherry's guilt.

Video of Jail Visit

{¶ 86} The basis for Cherry's argument regarding a recording of a jail visit with Jaeda is not clear, and Cherry did not object to the playing of this recording at trial. The

portion played for the jury depicted a conversation between Cherry and Jaeda in which Cherry threatened to punch her in the face if she were late again, and she responded, "Yes Daddy." Plain error is not demonstrated in the admission of the video.

Drug related evidence

{¶ 87} Defense counsel objected to the admission of drug test results after such tests were performed on Cherry. In response, the State argued that the case revolved around Cherry's belief that J.S. had worn a wire on him, and although this belief had been inaccurate, drug paraphernalia and substantial amounts of drugs had been found in Cherry's trailer. The court excluded the drug test results as irrelevant and instructed the jury to disregard the prosecutor's remarks about the exhibits that were being excluded.

{¶ 88} Cherry asserts that, although the court properly excluded evidence of the drug test results, the State nonetheless managed to mention evidence "that was not related to [the] charges and was completely irrelevant." The State notes that the court sustained Cherry's objection and "explicitly instructed the jury not to consider the drug results," which was "the most favorable outcome the defense could hope for." We "generally presume that a jury will follow the trial court's limiting instructions concerning the evidence that may be considered and for what purpose, as well as curative instructions to disregard testimony." *State v. Green*, 2020-Ohio-5206, ¶ 87 (2d Dist.) As such, we cannot conclude that the trial court abused its discretion in handling this matter as it did.

{¶ 89} Having reviewed each aspect of Cherry's second assignment of error, we conclude that the trial court did not abuse its discretion in these rulings. Cherry's second

assignment of error is overruled.

{¶ 90} Cherry's third assignment of error is as follows:

APPELLANT'S CONVICTION IS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 91} Cherry asserts that the State did not meet its burden to prove that J.S. did not come to Cherry's home already injured. Cherry argues that evidence around the circumstances of the beating was lacking and that, if J.S. were badly beaten in the trailer, "where was the blood splatter?" He argues that there was little evidence, other than hearsay, that Cherry was the one who harmed the victim. "No evidence was presented that she did not come to his home already in that state, other than the statements from two witnesses that bring their own histories with the justice system to court."

{¶ 92} " 'A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law.' " (Citations omitted.) *State v. Williams*, 2022-Ohio-2517, ¶ 44 (2d Dist.)

"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

> *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two
> of the syllabus.

*State v. Stutz*, 2020-Ohio-6959, ¶ 11 (2d Dist.).

{¶ 93} R.C. 2905.01(A)(3) proscribes kidnapping and states: "No person, by force, threat, or deception, . . . shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: . . . (3) To terrorize, or to inflict serious physical harm on the victim or another." R.C. 2903.11(A)(2) proscribes felonious assault: "(A) No person shall knowingly do either of the following: . . . (2) Cause or attempt to cause physical harm to another . . . by means of a deadly weapon or dangerous ordnance." R.C. 2909.05(A)(2) governs abduction: "(A) No person, without privilege to do so, shall knowingly do any of the following: . . . (2) By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear." Finally, R.C. 2923.13 defines having a weapon while under disability: "(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply: (1) The person is a fugitive from justice."

{¶ 94} As discussed above, Christy and J.S. testified consistently that, from September 29-30, 2023, Cherry had held J.S. captive and beat her repeatedly with a tequila bottle and a pistol because he believed she had worn a wire to record him. J.S.'s injuries were consistent with the version of events told by Christy and J.S., and specific items described by J.S. were found in Cherry's trailer. J.S.'s blood was also found there.

J.S. told Officer Devore and Detective Fent that Cherry had caused her injuries. Moreover, in his recorded jail calls, Cherry schemed to avoid being held accountable, and evidence of a prior conviction that precluded Cherry from possessing a gun was presented. Having reviewed the entire record in a light most favorable to the State, we conclude that Cherry's convictions for kidnapping, felonious assault, and having weapons while under disability were supported by sufficient evidence. The State was not required to affirmatively disprove Cherry's version of the events. Cherry's third assignment of error is overruled.

{¶ 95} Cherry's fourth assignment of error is as follows:

APPELLANT'S PRISON SENTENCE IS CONTRARY TO LAW.

{¶ 96} According to Cherry, the court had the discretion to impose prison time for each firearm specification, but it was not required to do so. The State argues that Cherry's sentence is not contrary to law.

{¶ 97} "When reviewing felony sentences, a court of appeals must apply the standard of review set forth in R.C. 2953.08(G)." *State v. Williams*, 2022-Ohio-2897, ¶ 18 (2d Dist.), citing *State v. Farra*, 2022-Ohio-1421, ¶ 73 (2d Dist.). Under that statute, an appellate court may increase, reduce, or modify a sentence, or vacate it altogether and remand for resentencing, "only if it clearly and convincingly finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law." *State v. Worthen*, 2021-Ohio-2788, ¶ 13 (2d Dist.).

{¶ 98} "Nothing in R.C. 2953.08(G)(2) permits an appellate court to independently weigh the evidence in the record and substitute its judgment for that of the trial court

concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *State v. Jones*, 2020-Ohio-6729, ¶ 42. "The inquiry is simply whether the sentence is contrary to law." *State v. Bartley,* 2023-Ohio-2325 ¶ 9 (2d Dist.). "A sentence is contrary to law when it falls outside the statutory range for the offense or if the sentencing court does not consider R.C. 2929.11 and 2929.12." *Id.*, citing *State v. Dorsey*, 2021-Ohio-76, ¶ 18 (2d Dist.).

**{¶ 99}** In *State v. Bollar*, 2022-Ohio-4370, the trial court had merged involuntary-manslaughter and felonious-assault counts and imposed three-year prison terms for each of the firearm specifications attached to those counts. In *Bollar,* the Ohio Supreme Court held that the trial court was required to impose separate prison terms for multiple firearm specifications, even if the underlying involuntary manslaughter and felonious assault convictions to which the firearm specifications related had been merged at sentencing as allied offenses. *Id.* at ¶ 19, *abrogating State v. Roper*, 2013-Ohio-2176 (9th Dist.); *State v. Doyle*, 2019-Ohio-979 (8th Dist.).

**{¶ 100}** R.C. 2929.14(B)(1)(b) provides that "[e]xcept as provided in division (B)(1)(g) of this section, a court shall not impose more than one prison term on an offender under division (B)(1)(a) of this section for felonies committed as part of the same act or transaction." The general rule in R.C. 2929.14(B)(1)(b) is subject to the exception set forth in R.C. 2929.14(B)(1)(g), which provides:

> If an offender is convicted of or pleads guilty to two or more felonies, if one
> or more of those felonies [is] . . . felonious assault, . . . and if the offender is
> convicted of or pleads guilty to a specification of the type described under

division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶ 101} In *State v. Mingo*, 2024-Ohio-543, ¶ 52 (9th Dist.), the Ninth District, citing *Bollar*, noted that "convicted," as used in R.C. 2929.14(B)(1)(g), means " 'found guilty,' " and that "*Bollar* does not only apply in cases where the defendant pleaded guilty." It quoted *Bollar,* as follows:

[R.C. 2929.14(B)(1)(g)] requires that the offender receive prison terms for each of the two most serious firearm specifications when the offender pleads guilty to multiple felony offenses (and at least one of those is a felony listed in the statute) and also pleads guilty to multiple accompanying specifications. [R.C. 2929.14(B)(1)(g)] makes no exception to the application of its provisions when one of the underlying felony offenses has been merged. Instead, it simply applies whenever the offender has pleaded guilty to (or been found guilty of) multiple felony offenses and multiple specifications. Here, Bollar pleaded guilty to multiple felonies and multiple specifications. Thus, according to the plain language of the statute, he must receive prison terms for the two most serious specifications to which

he pleaded guilty.

*Mingo* at ¶ 52, quoting *Bollar* at ¶ 19.

**{¶ 102}** Based upon the foregoing, we conclude that Cherry's sentence is not contrary to law. Pursuant to R.C. 2929.14(B)(1)(g), the trial court properly imposed prison terms for the two firearm specifications. Cherry's fourth assignment of error is overruled.

## Conclusion

**{¶ 103}** Ineffective assistance of counsel is not demonstrated in counsel's failure to file a motion to suppress Cherry's interview with law enforcement or in failing to object during closing argument to the State's suggestion that Cherry was involved in dealing narcotics. An abuse of discretion is not demonstrated in the trial court's admission of recorded communications from the jail or other statements that fell within exceptions to the hearsay rule. Sufficient evidence supported Cherry's convictions, and his sentence is not contrary to law. Accordingly, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and WELBAUM, J., concur.