[Cite as *State v. Toleque*, 2026-Ohio-820.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO, | Case No.  25CA-A-05-0039 |
| Plaintiff - Appellee | <u>Opinion & Judgment Entry</u> |
| -vs- | Appeal from the Court of Common Pleas of Delaware County, |
| BRANDON MICHAEL TOLEQUE, | Case No. 23CR-I-11-0675 |
| Defendant - Appellant | Judgment:  Affirmed |
| | Date of Judgment:  March 11, 2026 |

BEFORE: Craig R.  Baldwin, Robert G.  Montgomery, and David M.  Gormley, Judges

APPEARANCES: Melissa A. Schiffel (Delaware County Prosecuting Attorney) & Katheryn L. Munger (Assistant Prosecuting Attorney), Delaware, Ohio, for Plaintiff-Appellee; April F. Campbell, Dublin, Ohio, for Defendant-Appellant.

*Gormley, J.*

**{¶1}**   Defendant Brandon Toleque challenges his murder, kidnapping, and rape convictions following a jury trial in Delaware County.  He raises several assignments of error, disputing the trial court's admission of certain testimony, questioning that court's failure to merge the murder and kidnapping convictions, challenging the imposition of prison terms on two rather than just one firearm specification, and calling into question the sufficiency and weight of the evidence.  Finding no error in the trial court's handling of these issues and no lack of evidence supporting the jury's verdicts, we affirm.

**The Key Facts**

**{¶2}**   On an evening when Toleque brought two friends (or at least acquaintances) of his — S.G. (a woman) and A.R. (her boyfriend) — to his Delaware

County home, those two guests began arguing. The argument escalated, and A.R. struck S.G. while Toleque was upstairs. Later that evening — after S.G. had joined Toleque upstairs — A.R., too, began coming up the stairs. Toleque then ran down the stairs and shot A.R. in the torso with a semi-automatic pistol. A.R. collapsed near the bottom of the stairs. (Trial testimony indicated that A.R. was at least badly injured by the shot but perhaps did not die immediately. He had succumbed to his wound by the time law-enforcement officers arrived at the home roughly six hours after the shooting.)

{¶3} After he shot A.R., Toleque told S.G. to shut up or he would kill her too. He pointed the handgun at her and instructed her to go upstairs and put on a pair of his shorts. S.G. did as she was told, and she saw Toleque drag the fatally injured A.R. away from the front door. S.G. then left with Toleque in his vehicle, leaving behind her phone, wallet, shoes, and shirt. When asked at trial why she left, S.G. told jurors that she had no choice in the matter.

{¶4} Video footage from a home-security camera at Toleque's residence recorded S.G.'s departure from the home. A detective who later reviewed that footage testified at the trial that S.G. appeared to him to be scared as she left the home, and he explained that he saw in the video no coat, no shirt, no phone, no wallet, and no shoes with S.G.

{¶5} Once Toleque and S.G. were in Toleque's vehicle, he drove the two of them westward from Delaware County. They stopped at a gas station and then at a McDonald's parking lot in Bellefontaine, Ohio. There, Toleque made S.G. perform oral sex on him in the backseat of the car and then vaginal intercourse. They then drove to a dark residential street nearby where Toleque engaged in vaginal intercourse with S.G. a second time.

**{¶6}** S.G. testified at Toleque's trial that these acts were not consensual. When asked why she participated, she said that Toleque had threatened her life, and she was scared. At each stop along the route, S.G. stayed in the car because — according to her trial testimony — she was terrified and believed that Toleque still had a weapon.

**{¶7}** Eventually, Toleque and S.G. reached Indiana, where a local law-enforcement officer signaled to Toleque to stop his vehicle after that officer saw the vehicle speeding. When Toleque kept driving without stopping, a 30-mile high-speed pursuit ensued, with Toleque's vehicle at times reaching speeds over 100 mph. During the chase, multiple pursuing law-enforcement officers saw the passenger door of Toleque's vehicle swing open more than once. S.G. testified at the trial that she had been trying to jump from the moving vehicle then and had grabbed the steering wheel in an effort to prompt Toleque to stop. Roughly six hours after Toleque shot A.R. in Delaware County, the high-speed pursuit in Indiana finally ended when Toleque ran out of gas.

**{¶8}** As law-enforcement officers swarmed around the stopped vehicle, both Toleque and S.G. stepped out. As S.G. emerged, she screamed that her boyfriend had been killed by Toleque. An Indiana police officer who was there that day told jurors that S.G. was frantic and screaming, and he said that she clawed at his uniform and was inconsolable. S.G. told officers that she had been held against her will, that someone had been killed, and that she had been forced to have sex. She cried, screamed, and flailed after she was seated in an officer's vehicle that day. A nurse at a nearby hospital where officers took S.G. then performed a sexual-assault examination and collected hair and other biological evidence from her.

**{¶9}** Meanwhile, acting on information from Indiana officials, officers from the Powell Police Department went to Toleque's home in Delaware County. When they entered, they found A.R.'s body on the home's main floor. A handgun was on a kitchen counter, and a second firearm was found on a bed upstairs.

**{¶10}** A ballistics analysis — the jurors were told — later confirmed that the firearm on the bed was the firearm that had discharged the projectile recovered from A.R.'s body. Trial testimony also indicated that DNA found on the grip of that gun was consistent with Toleque's own DNA, and a forensic scientist who examined semen and blood collected from S.G.'s vaginal area and cervix during her sexual-assault examination in Indiana told jurors that Toleque was a major contributor of the DNA in those fluids.

**{¶11}** Toleque himself testified at his trial, and he claimed that A.R. had attacked him at the top of the stairs and had struck him in the head, prompting Toleque — he told jurors — to shoot A.R. in self-defense. Toleque also testified that his sexual encounters with S.G. during their westward car trip had been consensual.

**{¶12}** The jury found Toleque guilty on charges of murder, kidnapping, and rape, and he was sentenced to a lengthy prison term. Toleque now appeals.

## The Excited-Utterance Exception Applies to S.G.'s Out-of-Court Statements

**{¶13}** Toleque argues first that the trial court abused its discretion by allowing Indiana law-enforcement officers to testify during the trial about statements they heard S.G. make on the day of the high-speed car chase. The trial court's decision to allow those officers to recount for the jury the remarks S.G. made that day was grounded on the hearsay rule's excited-utterance exception. Toleque argues here, though, that the roughly six-hour gap between the shooting in Delaware County and S.G.'s statements in

Indiana — together with her seemingly calm appearance on the security-camera video recording that captured her departure with Toleque from the residence soon after the shooting — should have prompted the trial judge to exclude S.G.'s hearsay statements.

{¶14} The admission of relevant evidence lies within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). An abuse of discretion has occurred when the trial court's decision was "unreasonable, arbitrary, or unconscionable" and was not "merely an error of law or judgment." *State v. Thompson*, 2015-Ohio-92, ¶ 18 (5th Dist.), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Out-of-court statements that qualify as excited utterances are not excluded under the hearsay rule, even when the declarant is available as a witness. Evid.R. 803(2); *State v. Wallace*, 37 Ohio St.3d 87, 88 (1988).

{¶15} An excited utterance is a statement about a startling event or condition made while the declarant is under the stress of excitement caused by that event. Evid.R. 803(2). Ohio courts apply a four-part test when weighing whether the hearsay rule's excited-utterance exception applies to a person's out-of-court statement: (1) a startling event that produced nervous excitement in a person must have occurred, and that event must have been sufficient to limit that person's ability to reflect and deliberate before speaking; (2) that person's statement must have been made before the nervous excitement lost its domination over his or her reflective faculties; (3) the statement must relate to the startling occurrence or its circumstances; and (4) the declarant must have had an opportunity to personally observe the matters asserted. *State v. Jones*, 2012-Ohio-5677, ¶ 166.

**{¶16}** All four of those elements were met here.  First, a series of startling occurrences had no doubt occurred.  S.G. had watched Toleque gun down her boyfriend, and then she had had the gun pointed at her, was threatened with death, was driven from Ohio to Indiana, and was compelled to engage multiple times in what she viewed as nonconsensual sexual activity.  A more startling series of events in the course of just a few hours would be hard to conceive.

**{¶17}** Second, the evidence established that S.G.'s nervous excitement had not subsided when she made the statements recounted by the Indiana officers who testified at the trial.  There is no set amount of time after which a statement can no longer qualify as an excited utterance, and instead the central requirements are that (a) the statement was made while the declarant remained under the stress of the startling event, and (b) the statement was not the product of reflective thought.  *State v. Triplett*, 2013-Ohio-3114, ¶ 27 (5th Dist.), citing *State v. Taylor*, 66 Ohio St.3d 295 (1993).  "[I]t is only necessary that the declarant still appeared nervous or distraught and that there was a reasonable basis for continuing to be emotionally upset."  *State v. Martin*, 2016-Ohio-225, ¶ 58 (5th Dist.).

**{¶18}** Here, even after the stop, S.G. was at times on the ground yelling uncontrollably for help, crying so much that she could barely be understood, and curled in a fetal position while screaming.  At the roadside in Indiana, S.G. was not someone who had regained her reflective faculties.

**{¶19}** Moreover, the events of that night unfolded in one continuous sequence.  S.G. had no opportunity to be free of the stress of witnessing a fatal shooting before the alleged kidnapping and then the alleged rapes and then the dangerous high-speed chase

took place.  S.G.'s chain of startling experiences was constant from the moment she witnessed the shooting until Toleque's vehicle came to a stop as the police closed in.

**{¶20}** Third, S.G.'s statements related directly to the startling events.  She told officers about being held against her will, about someone having been shot and killed, and about being forced to engage in sexual activity.  Her screaming and pleas for help were directed at finding A.R. (or least revealing his fate), and her statements plainly concerned the day's startling occurrences.

**{¶21}** Fourth, S.G. personally observed the matters she described.  She was an eyewitness to the alleged murder, was the victim of the alleged kidnapping, and was the victim of the alleged rape or rapes.

**{¶22}** The trial court reviewed the evidence, applied the correct legal standard, and articulated its reasoning on the record.  Its conclusion that S.G. remained under the stress of the events when she made her statements was neither arbitrary, unreasonable, nor unconscionable.  The first assignment of error is overruled.

## The Rape and Kidnapping Convictions Were Supported by Sufficient Evidence

**{¶23}** Next, we turn to Toleque's argument that the State failed to present sufficient evidence to support his conviction on the rape charge and on the kidnapping charge.

### Standard of Review

**{¶24}** "When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed but, rather, whether the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'"  *State v. Pountney*, 2018-Ohio-22, ¶ 19, quoting *State v. Jenks*, 61 Ohio St.3d

259 (1991), paragraph two of the syllabus. "'The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Howell*, 2020-Ohio-174, ¶ 28 (5th Dist.), quoting *Jenks* at paragraph two of the syllabus. A "verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997).

The Rape Charge

{¶25} Toleque contends that the State failed to present sufficient evidence to sustain his rape conviction under R.C. 2907.02(A)(2) (sexual conduct involving a defendant who purposely compels the alleged victim to submit by force or threat of force). Toleque's sufficiency argument focuses on two issues: first, an alleged failure on the State's part to establish venue in Delaware County, and second, a claim that no evidence suggested that he purposely compelled S.G. to submit by force or threat of force. Neither argument holds up.

{¶26} We turn first to venue. Undeniably, the alleged rape did not occur in Delaware County. Both acts of sexual assault that S.G. described for the jury took place as she and Toleque traveled from central Ohio toward Indiana: the first in a McDonald's parking lot near Bellefontaine (in Logan County) and the second on a nearby residential street.

{¶27} R.C. 2901.12(H) provides that when an offender commits offenses in different jurisdictions as part of a course of criminal conduct, the offender may be tried in any jurisdiction in which one of those offenses or any element of those offenses took

place. The alleged murder occurred in Delaware County. The alleged kidnapping started in Delaware County and then continued elsewhere. The alleged rape was committed as part of the same chain of events as the kidnapping, involved the same victim as the kidnapping, and occurred along Toleque's line of travel as he distanced himself from the site of the alleged murder. Consistent with R.C. 2901.12(H)'s broad course-of-conduct language, the case was permissibly tried in Delaware County.

{¶28} As for the elements of the rape charge that Toleque says were lacking from the State's proof, we see evidence in the record both of sexual conduct and of purposeful compulsion with force or threat of force.

{¶29} As to sexual conduct, S.G. testified to three separate acts of rape. First, Toleque compelled S.G. to perform oral sex on him: "He made me put his penis in my mouth," she told jurors. He then engaged in vaginal intercourse with S.G. against her will in the backseat of his vehicle. Finally, Toleque directed S.G. to bend over in the vehicle's front seat while he penetrated her vagina as he stood outside the vehicle and ejaculated inside her without a condom.

{¶30} Toleque himself confirmed at trial that oral sex and vaginal intercourse had occurred, and DNA analysis of S.G.'s rape kit confirmed Toleque as a major contributor of sperm cells found in her vagina. The element of sexual conduct was amply established.

{¶31} As to force or threat of force, Toleque argues that any threat he made to kill S.G. at the home in Delaware County was temporally disconnected from the sexual acts in or near Bellefontaine, and he claims that nothing else he said or did can be construed as evidence of force or the threat of force against S.G. We disagree.

**{¶32}** Force need not be overt and physically brutal. It may instead be subtle and psychological, as long as the victim's will was overcome by fear or duress. *State v. Dye*, 82 Ohio St.3d 323, 327–328 (1998). In other words, a defendant purposely compels submission by force or threat of force when that defendant creates a belief in the mind of another that physical force will be used if that other person does not submit. *State v. Schaim*, 65 Ohio St.3d 51 (1992), paragraph one of the syllabus.

**{¶33}** Here, Toleque's use of force entailed more than a single or isolated verbal threat. He engaged in a sustained course of terrorizing conduct. Toleque shot and killed S.G.'s boyfriend in front of her. He pointed the gun at her and threatened to kill her. He forced her to remove some of her own clothing and to put on shorts belonging to him. He seized her phone. He drove her across state lines to unfamiliar locations while she had no phone, no identification, no wallet, no shoes, and no shirt. She was isolated in an area hundreds of miles from anyone she knew, alone with a man who had just killed someone and who she believed still had a firearm. When asked at the trial whether she had engaged in the sexual activity by choice, S.G. answered "no" unequivocally, explaining that she was scared by his threat to her life.

**{¶34}** S.G.'s behavior during the high-speed car chase confirms the depth of her fear. She tried to jump from a moving vehicle. She grabbed the steering wheel as the vehicle's speed hovered around 100 mph. She waved her arms out the window and attempted to open her door. Minutes later, once in the safety of a police cruiser, she screamed, cried, and flailed about. This was not the conduct of someone who had recently engaged in consensual sex.

**{¶35}** As the jury saw on video recordings that captured the drama at the Indiana roadside, S.G.'s extreme distress persisted hours after Toleque's alleged threat to shoot her at the house in Delaware County, and that extended and extreme anguish on her part speaks to the physically violent and mentally agonizing circumstances that surrounded the entire episode in general and the sexual activity in particular.

**{¶36}** Viewing the evidence in a light most favorable to the prosecution, we readily conclude that a rational trier of fact could find that the State presented proof beyond a reasonable doubt on each element of the rape charge. Toleque's sufficiency challenge to his rape conviction fails.

The Kidnapping Charge

**{¶37}** Toleque next argues that the State's evidence was insufficient to support his kidnapping conviction under R.C. 2905.01(A)(2), which prohibits a defendant from using force, threat, or deception to remove another from the place where that person is found or to restrain that person's liberty for the purpose of facilitating the commission of a felony or flight after such a crime. Toleque contends that S.G. voluntarily left the house in Delaware County with him and was never restrained. The record belies this claim.

**{¶38}** S.G. testified that Toleque shot A.R., pointed a gun at her, and told her he would kill her too. He made her go upstairs and change clothes. He took her phone. She then left with him without her phone, wallet, shoes, or shirt. When asked why she went, she stated that she had no choice because she was afraid for her life. A Powell police detective who reviewed home-security video footage of S.G.'s departure testified that she appeared to be scared and seemingly had no coat, no shirt, no phone, no wallet,

and no shoes.  Common sense tells us that a young woman voluntarily embarking on a multi-hour trip across state lines would have brought most if not all of these items.

{¶39} Then once in the vehicle, S.G. remained under Toleque's control.  She testified at the trial that at each stop on the westward car trip, she remained in the vehicle because she was terrified and believed that Toleque still had a weapon.  She was in an unfamiliar location with no means of contacting anyone.  And when police finally appeared, her reaction left no room for doubt: she tried to jump from the moving car, grabbed the steering wheel as the vehicle moved at high speed, waved her arms, and hit Toleque in an effort to make him stop.  She testified that she was trying to indicate that she wanted out, and yet even so, Toleque continued his high-speed flight from the pursuing officers.

{¶40}  The evidence here shows that S.G.'s journey from Delaware County to the roadside in Indiana was a product of force and threats, and Toleque arguably took S.G. with him to facilitate what he hoped would be his escape after committing a murder. Toleque's sufficiency challenge to his kidnapping conviction falls short.

**Toleque's Convictions Were Not Against the Manifest Weight of the Evidence**

{¶41} Toleque argues next that his convictions on the rape charge, on the kidnapping charge, and on the murder charge were against the manifest weight of the evidence.

Standard of Review

{¶42}  In determining whether a felony conviction was against the manifest weight of the evidence, an appellate court acts as a thirteenth juror, and "after 'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility

of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be [reversed] and a new trial ordered.'" *State v. Hane*, 2025-Ohio-120, ¶ 20 (5th Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The reversal of a conviction on manifest-weight grounds should occur only in "the 'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*

{¶43} "Weight of the evidence concerns the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them." *Thompkins* at 387 (emphasis in original) (quotations and citation omitted). "[A]n appellate court will leave the issues of weight and credibility of the evidence to the factfinder, as long as a rational basis exists in the record for its decision." *State v. Sheppard*, 2025-Ohio-161, ¶ 66 (5th Dist.).

The Rape Charge

{¶44} Toleque argues that his conviction for rape was against the manifest weight of the evidence because, he says, the sexual activity was consensual.

{¶45} A trier of fact is free to believe all, some, or none of the testimony of each witness, and a conviction may rest solely on the testimony of one witness. *State v. Penland*, 2023-Ohio-806, ¶ 51 (8th Dist.).

{¶46} Here, the jury had ample reason to credit S.G.'s testimony over Toleque's. Her version of events was supported by DNA evidence, by her emotional state on video

recordings, by the home-security video footage showing her leaving the home without shoes and other basic items, and by the testimony of police officers who interacted with her.

{¶47} Toleque's claim of consensual sex, by contrast, could reasonably have been viewed by the jury as less believable. As the prosecutor established on cross-examination of him, Toleque's version of the story called for jurors to believe that after he shot and killed S.G.'s boyfriend, after she left the house with no shirt, no shoes, no identification, and no phone, and after he kept her in the vehicle for hours, S.G. consented to — or, according to Toleque, initiated — unprotected sex with him while inside his car in a residential neighborhood. The jury was free to reject this account and does not appear to have been irrational in doing so.

{¶48} This is not the exceptional case in which the evidence weighs heavily against the conviction. The jury did not lose its way. The manifest weight of the evidence supports the rape conviction.

The Kidnapping Charge

{¶49} For the same reasons, the kidnapping conviction was not against the manifest weight of the evidence. S.G.'s testimony about the circumstances of her departure — the death threat, the gun, the absence of her belongings, her fear, her inability to escape — was consistent with available video recordings and other physical evidence and was supported by the testimony of police officers and the detective. The verdict indicates that the jury concluded that S.G. did not leave Toleque's home voluntarily and did not remain in his vehicle by choice, and that view of the evidence seems entirely reasonable in light of the evidence. S.G.'s desperate efforts to escape the vehicle as the

police pursuit unfolded points to the involuntarily nature of her presence there. The kidnapping conviction is supported by the evidence.

The Murder Charge

{¶50} Toleque argues that the manifest weight of the evidence shows that he shot A.R. in self-defense. We find otherwise.

{¶51} Toleque testified that A.R. attacked him at the top of the stairs, striking Toleque twice in the head, and Toleque said, too, that his discharge of the firearm occurred while Toleque was at the same time blocking A.R. from striking him with a hard object. Several features of the evidence, though, cast doubt on this account. First, no hard object or other weapon was found at the top of the stairs or near A.R.'s body on the first floor. Toleque's explanation — that A.R. had on the stairs a gun that Toleque moved to the kitchen and disassembled — could reasonably have struck the jury as implausible. Second, the Powell police detective testified that he found "zero evidence" of self-defense. No firearm was near the body, neither Toleque nor A.R. showed any signs of having sustained significant injuries aside from A.R.'s fatal gunshot wound, and S.G. — the only eyewitness — disputed Toleque's claim that an altercation between the two men occurred in the moments before the shooting. Third, Toleque admitted on cross-examination that A.R. had never made any threatening statements toward him, and he never testified that he feared for his life.

{¶52} Further, S.G. testified that Toleque ran down the stairs toward A.R. and shot him without provocation before threatening to do the same to her. S.G.'s account was consistent with the physical evidence — the location of the blood pool, the position of the

body, the absence of any weapon near A.R. — and with Toleque's own conduct in the aftermath.

**{¶53}** And Toleque's post-shooting behavior was inconsistent with a credible claim of self-defense. He tried to move A.R.'s body. He made phone calls to friends rather than to police or emergency services. He took S.G.'s phone. He fled the state with the only eyewitness. A person who had acted justifiably would have had no reason to reposition the body, take away the eyewitness's ability to communicate with others, and flee the jurisdiction.

**{¶54}** This is not an exceptional case warranting reversal on manifest-weight grounds. The evidence supports Toleque's murder conviction.

## The Trial Court Correctly Declined to Merge the Murder and Kidnapping Charges

**{¶55}** Toleque argues that the crimes of murder and kidnapping in this case were allied offenses of similar import and should have been merged. In support of that view, he points to the fact that the indictment alleged that he had committed the kidnapping "for the purpose of facilitating the commission of . . . [m]urder . . . or flight thereafter."

**{¶56}** We review a trial court's merger determination with fresh eyes. *State v. Bailey*, 2022-Ohio-4407, ¶ 6, citing *State v. Williams*, 2012-Ohio-5699, ¶ 1.

**{¶57}** Under R.C. 2941.25, when a defendant's conduct constitutes two or more allied offenses of similar import, the defendant may be convicted of only one. In determining whether offenses merge, a court asks three questions: (1) whether the crimes were dissimilar in import or significance, meaning did they involve separate victims or separate and identifiable harm; (2) whether the offenses were committed separately; and (3) whether the crimes were committed with separate animus or motivation. An

affirmative answer to any of these questions permits separate convictions and sentences. *State v. Ruff*, 2015-Ohio-995, ¶ 24–26.

**{¶58}** All three questions are answered in the affirmative here.

**{¶59}** First, the offenses involved separate victims and separate harm. A.R. was the murder victim, while S.G. was the kidnapping victim. A.R.'s fate was death, while S.G. was forced to travel to Indiana and was compelled to participate in unwanted sexual violence along the way. The harm for each victim was distinct, just as the elements for the two crimes are distinct.

**{¶60}** Second, the offenses were committed separately. The primary inquiry for determining whether kidnapping merges with another offense is whether the restraint or movement of the victim is merely incidental to a separate underlying crime or whether it has significance independent from the other offense. *State v. Morrissey*, 2021-Ohio-4471, ¶ 35 (3d Dist.), citing *State v. Logan*, 60 Ohio St.2d 126, 135 (1979). Here, the murder was complete before the kidnapping began. Toleque shot A.R., and A.R. died. Toleque then removed S.G. from the house and drove her hundreds of miles. The kidnapping was not incidental to the murder but was instead an independent criminal act that subjected S.G. to a substantial increase in risk of harm wholly separate from the harm A.R. suffered.

**{¶61}** Toleque argues that because the kidnapping charge was predicated on facilitating flight from the murder, the two offenses are inextricably linked. But the fact that one offense references another as an element does not automatically require merger. The *Ruff* framework calls for an examination of the defendant's conduct, not merely a comparison of the statutory elements. *State v. Smith*, 2023-Ohio-866, ¶ 9 (6th Dist.),

citing *Ruff* at ¶ 30. Toleque's conduct in shooting A.R. and his conduct in forcing S.G. to travel with him for miles and miles were distinct acts separated by time, location, and purpose.

{¶62} Third, the offenses were committed with separate animus. Where the restraint of the victim is prolonged, the confinement secretive, or the movement substantial, a separate animus exists for each offense. *Morrissey* at ¶ 35. The movement here was extraordinary, spanning several hours and crossing state lines. The animus of the murder was to kill A.R. The animus, it seems, of the kidnapping was at least in part to prevent S.G. from reporting the murder and to facilitate Toleque's flight from the consequences of his initial crime.

{¶63} The kidnapping offense was not an allied crime with the act of murder, and the trial court rightly declined to merge the two charges.

## Toleque Was Properly Sentenced on Two Firearm Specifications

{¶64} Toleque, in his final assignment of error, challenges the trial court's imposition of prison terms on two firearm specifications rather than just one.

{¶65} One of the three-year firearm specifications in the case was appended to the murder charge on which Toleque was convicted — the R.C. 2903.02(B) charge discussed above — while the other three-year firearm specification was appended to an additional murder charge that was presented to the jury. That second charge alleged, in accordance with R.C. 2903.02(A), that Toleque had purposely caused A.R.'s death. The jury found Toleque guilty on both murder charges, and jurors also found that the State had proved each murder charge's firearm specification beyond a reasonable doubt.

**{¶66}** When the trial judge sentenced Toleque, the judge of course merged the two murder counts — there was, after all, just one murder victim — but the judge imposed three-year consecutive prison terms for each of the two firearm specifications, including the specification appended to the purposeful-killing murder charge that had been merged with the R.C. 2903.02(B) murder charge.

**{¶67}** That imposition by the trial court of three-year sentences for two rather than just one firearm specification was wrong, Toleque says, and he cites R.C. 2929.14(B)(1)(b), which directs trial judges to impose no more than "one prison term" for firearm specifications appended to felony charges alleging offenses that are "committed as part of the same act or transaction."

**{¶68}** Yet R.C. 2929.14(B)(1)(b), in setting that limit of "one prison term," contains these key words: "except as provided in division (B)(1)(g) of this section." That latter provision in turn tells us that if an offender is found guilty on two or more felony charges, one or more of which is murder, and if that same offender is also convicted of firearm specifications in connection with two or more of those felonies, the sentencing court must impose prison terms "for each of the two most serious specifications." R.C. 2929.14(B)(1)(g).

**{¶69}** As the Supreme Court of Ohio has noted, that statute "makes no exception to the application of its provisions if one of the underlying felony offenses has been merged." *State v. Bollar*, 2022-Ohio-4370, ¶ 19. In *Bollar*, the Supreme Court, applying the statute as it is written, affirmed the imposition of prison terms for two firearm specifications in a case in which the criminal offenses to which those firearm specifications were attached had been merged as allied offenses.

**{¶70}** Toleque nonetheless urges us to find that *Bollar* does not apply here because the defendant in that case pled guilty, whereas Toleque was of course found guilty by a jury. Noting that R.C. 2929.14(B)(1)(g) applies when a defendant "is convicted of" or pleads guilty to two or more specified felonies, Toleque contends that that phrase cannot rightly be applied to the merged R.C. 2903.02(A) murder charge on which he was found guilty but for which he was never sentenced and on which he was, therefore, in his view, never "convicted."

**{¶71}** Multiple Ohio appellate courts have rejected the kind of narrow reading of "convicted" in R.C. 2929.14(B)(1)(g) that Toleque presses here. *See, e.g., State v. Hodge*, 2025-Ohio-4434, ¶ 130 (10th Dist.) ("We find unpersuasive appellant's attempt to distinguish *Bollar* on the basis that, unlike the defendant in *Bollar*, because he did not plead, he cannot be 'convicted' when counts merge") (quotations omitted); *State v. Cherry*, 2024-Ohio-5344, ¶ 102 (2d Dist.) (holding that "the trial court properly imposed prison terms for the two firearm specifications" and embracing the view that the term "convicted" in R.C. 2929.14(B)(1)(g) means "found guilty"); *State v. Mingo*, 2024-Ohio-543, ¶ 52 (9th Dist.) ("*Bollar* does not only apply in cases where the defendant pleaded guilty").

**{¶72}** We agree with those appellate courts, particularly given that the Supreme Court in *Bollar* found that the term "convicted" in R.C. 2929.14(B)(1)(g) should be read as "found guilty." *Bollar* at ¶ 16. For us, that settles the question, given that Toleque was found guilty on both murder counts and on the firearm specifications appended to each of those charges. Though the allied murder offenses merged, R.C. 2929.14(B)(1)(g)

required the trial judge to impose prison terms for both firearm specifications.  Because the trial judge adhered to the law, Toleque's last assignment of error is overruled.

{¶73} For the reasons explained above, the judgment of the Court of Common Pleas of Delaware County is affirmed.  Any costs are to be paid by appellant Brandon Toleque.

By: Gormley, P.J.;

Baldwin, J. and

Montgomery, J. concur.